THE STATE V. THOMPSON, *Appellant.*

Division Two, February 4, 1896.

1. **Criminal Practice**: CONTINUANCE. A continuance was properly denied where the subpoena for an absent witness was issued on the day before the one on which the case was set for trial and the defendant knew the necessity of the witness's attendance ten days prior thereto.

2. **Criminal Law**: MURDER: POST MORTEM EXAMINATION: EVIDENCE. On a trial for murder caused by poisoning, the fact that the jars in which the stomach of deceased was placed by the physician making the post mortem examination were not hermetically sealed, does not render their analysis subsequently made inadmissible in evidence.

3. ————: ————: EVIDENCE: RES GESTAE. On a trial for murder charged to have been caused by poison contained in a lunch claimed to have been handed deceased by defendant, statements by deceased and a person who partook of the lunch with him as to their physical sufferings and feelings soon after eating the lunch are admissible as a part of the *res gestae.*

4. ————: ————: ————: ————. So in such case statements by the deceased to the person eating the lunch with him, made while eating it, as to how and from whom he received it, are competent as a part of the *res gestae.*

5. ————: ————. Unless writings are already in evidence in the case or are admitted to be genuine or the party is estopped from denying their genuineness, they can not be used for the purpose of proving handwriting by comparison.

*Appeal from St. Louis Criminal Court.*—HON. H. L. EDMUNDS, Judge.

REVERSED AND REMANDED.

*Marion C. Early* for appellant.

(1) The court erred in refusing to grant defendant's first application for a continuance: *First.* Because his counsel had not had sufficient time to prepare his

case for trial. *State v. Jewell*, 90 Mo. 467; *State v. Lewis*, 74 Mo. 222. *Second*. Because he had been unable to obtain a chemical analysis of the properties held by the state with a view to obtaining evidence upon his trial. *Third*. Because he had not obtained an inspection of certain writings alleged to be in the possession of the state with a view to securing evidence upon his trial. (2) The court erred in overruling defendant's second application for a continuance on the ground of an absent witness. Herein especial reference is made to defendant's first application for a continuance. *State v. Warden*, 94 Mo. 648. (3) The court erred in admitting the testimony of C. R. Sanger, relating to the analysis made by him. *First*. Because his testimony showed that the jar containing the stomach and other matters was not "hermetically sealed" as when it left the hands of the coroner. *Second*. Because the cheese turned over to him for analysis was not positively identified as a portion of the same cheese as that partaken of by the deceased. *Third*. Because the cheese, if the same, was not properly placed under seal immediately and the necessary precautions were not observed to procure a fair analysis. Taylor on Medical Jurisprudence, pp. 202–209; 2 Wharton and Stille, Medical Jurisprudence, secs. 4 and 17. *Fourth*. Because he was not acting under oath. Because he admits having allowed another person not produced in court, in the same room where the tests were conducted. It is sufficient grounds for the exclusion of such testimony that opportunity was offered for tampering with the articles submitted for analysis, and the slightest opportunity is fatal if offered. 2 Wharton and Stille on Medical Jurisprudence, sec. 18. (4) The court erred in admitting statements made by the deceased as a part of the *res gestae*, after he had left the place where the poisoning is alleged to have occurred. *State v. Rider*, 95 Mo.

474.  (5)  The court erred in admitting testimony as to statements obtained from defendant after his arrest. *State v. Maxwell*, 92 Mo. 542.  (6)  It was radical error for the court to admit certain irrelevant writings, produced by the state and marked exhibits "E, F, G, H, I," not already in evidence, simply for the purpose of comparison.  Rogers on Expert Testimony [2 Ed.], secs. 133, 136; *Rose v. Bank*, 91 Mo. 399; *Springer v. Hall*, 83 Mo. 697; *Doe v. Suckermore*, 5 A. and E. 791.  (7) It was radical error for the circuit attorney to state in his argument:  "Nobody knows who killed Joseph Cunningham, except the deceased and George Thompson. Cunningham is dead and can't tell, and this defendant won't tell.  Cunningham did tell!!  But the court has held that incompetent and I won't discuss it further." Again, turning to the defendant he said:  "George Thompson, I can't see how you can sit there with a frozen heart and see this poor widow (pointing to the widow of the deceased) and not be moved.  Hanging is too good for you, you ought to be taken out and in the presence of your wife and child, have your neck broke."  *Wilbur v. Railroad*, 48 Mo. App. 224; *Evans v. Trenton*, 112 Mo. 390; *State v. Fitzgerald*, 32 S. W. Rep. ——; *State v. Bobbst*, 32 S. W. Rep. 1149.

*R. F. Walker*, attorney general, for the state.

GANTT, P. J.—At the November term, 1894, the defendant George Thompson was indicted by the grand jury in the St. Louis criminal court for the murder of Joseph M. Cunningham, by administering strychnine to him in cheese.  He was arraigned on December 6, 1894, and entered a plea "not guilty."  The cause was then continued to the January term, 1895.  At the January term the cause was continued to the March term and set down for trial on March 4, 1895.  The

cause appears to have been again continued to March 18, 1895, at which time defendant applied for a continuance on account of the absence of one Lizzie Hardin, which was denied because the court found from the evidence that Lizzie Hardin was then present in court.    Thereupon the cause was reset for March 22, 1895, at which time defendant again applied for a continuance on the ground of the absence of a witness, one G. M. Lewis, alleged to be a resident of St. Louis. This witness was desired to testify that certain writings offered on the trial were not in the handwriting of defendant, but it appearing to the court that the subpoena for said witness had not issued until March 21, and that a copy of the coroner's inquest and the said letter referred to in the affidavit had been in the possession of defendant's attorney for ten days, the continuance was refused.    The jury was duly impaneled March 22 and on March 27 a verdict of guilty of murder in the first degree was rendered and motions for new trial and in arrest were made and overruled and defendant sentenced.

Joseph M. Cunningham was a man thirty-two years old, in good health. He was sexton of St. Peter's church, which was located on the corner of Lindell and Spring avenues in St. Louis. He had been sexton since Christmas, 1893.    Prior to his employment, the defendant George Thompson was sexton of said church. After the deceased took charge of the church the defendant sometimes assisted him in his duties.    The deceased was married and lived at Clayton, St. Louis county.    During the week of his death the deceased brought some mushrooms to a Mrs. McLean, who lived in the city.    On Saturday morning, September 29, he left his home at Clayton well and hearty.    F. S. Beckett was the organist of St. Peter's church at the time of the death of deceased.    On Saturday, September 29,

1894, he went to the church to practice for the next day's service. He reached the church at 2 o'clock P. M. Cunningham was working on the lawn as he came to the church. Beckett went in but only remained a few minutes; left the church and made two or three calls and returned about 4 o'clock P. M. and went to practicing. Cunningham, the deceased, was still sprinkling the lawn.

Some twenty or thirty minutes after his return to the church the deceased told him he had a lunch, and asked him if he would help him eat it. He said he would and deceased said he would be in and spread it out. When the deceased came in from the lawn he called the organist and together they went to the cellar. In the lunch there was a bottle of beer and a glass. He poured the organist a glass of beer and he drank it, and they both ate some cheese and crackers, and the organist ate a charlotte russe and a pear. The sexton ate heartily of the cheese and crackers. He had a good appetite. The organist only ate a small portion of the cheese and crackers compared to the amount which the deceased ate. The organist said the cheese tasted bitter and the deceased remarked that it was bitter. The organist did not feel any bad effects until he went upstairs. He left deceased before the latter had finished eating. He said: "I went up and I felt rather sick, at first dizzy, as I was practicing the organ, and I thought it would work off and then I got cramps and sort of stiffening, then I tried to walk out and at first I could not walk at all and then I relaxed, I went out all right, and then I had pains in the back and lockjaw and something of that kind all the time. The deceased came back as I was practicing and said there must have been something the matter with the cheese of the lunch. He said he felt quite sick. We compared notes and so found we were both feeling the

same." The witness then started for the doctor or something "and I had trouble in getting out; I could not." He said he had "a great many pains." "We both called for somebody and some men ran up." "He (the deceased) called 'help' repeatedly. Mr. Waitz, among others, came in a few minutes, and it must have taken five minutes then to obtain Dr. Love. During this time the deceased, Cunningham, at first had convulsions and then he got perfectly quiet after that, and didn't move a muscle." Dr. Love came and administered antidotes to witness. When witness and deceased compared notes they were both stiff.

The organist was then asked by the prosecuting attorney if he knew how this lunch came there or who brought it there and if Cunningham made any statement as they went to the lunch or were eating it as to where it came from. To this defendant objected. In the absence of the jury the witness answered "that while they were eating the lunch deceased commenced telling him that the lunch had been sent to him; that Mrs. McLean had sent it by her hired man." The court excluded this evidence. The witness identified the basket and the two articles of glassware. He also testified deceased drank a glass of the beer. He testified he discovered no bad taste about any of the lunch but the cheese.

Peter Waitz testified he worked at 3700 Lindell avenue for Mr. Alva Mansur. St. Peter's church was right across from Mr. Mansur's. He knew the defendant. Defendant had been sexton of St. Peter's church when it was on Grand avenue. He knew the deceased. Had known him eight years. On the afternoon of September 29, 1894, he saw defendant and deceased about 2:15 or 2:30 P. M. standing on the woodwork that goes in back of the church, talking to each other. They were just the width of the street from witness.

Deceased had been washing his sidewalk and was dressed in his working clothes. Defendant had on a blue working jacket and a white straw hat. About 4 o'clock the same afternoon he heard the cry for "help" from the church, and then heard it repeated and he went over to the church and was the first person that reached deceased. He found deceased already speechless and dying, and Beckett, the organist, unable to talk. He identified the basket and glasses and testified that the bottle had Anheuser-Busch trade mark. The witness undertook to tell that Beckett, the organist, said, in answer to Dr. Love's question how he was poisoned, "that Cunningham, the deceased, got some lunch from McLean's man," but he was not permitted to state that.

Hiram Stemberg testified he knew defendant. Defendant had been sexton of St. Peter's church and witness was member of the choir until Easter of 1894. Defendant ceased to be sexton about first of 1894. Some time in February, 1894, defendant met witness near the old church, corner Grand avenue and Olive, right across from Beer's hotel. They spoke and defendant had a bottle and he offered to pay witness to give it to Cunningham. He said it was blackberry brandy and whiskey. He said Cunningham gave him a mixture of that kind and it made him drunk and that caused him to lose his place as sexton. Witness took the bottle. It contained a liquid. He told him he would take it. Witness went back of the church and broke the bottle on a rock. This was Sunday night. The next Wednesday night after a rehearsal he met defendant again across the street from the church. He called witness to him and asked if he gave Cunningham the bottle and witness told him, "Yes;" when the prisoner called him a liar, and said: "If you had given him that bottle to drink, which I know you

didn't, he would be drunk for a week.'' About that time defendant gave Stemberg the bottle, he was working at Mrs. Gordon's, on Westminster Place and he said he was also doing chores for Rev. Dr. Short. He made the fire in the furnace and blacked his shoes.

Sarah Dito testified she was a domestic servant in the employment of Mrs. Thomas McLean, 3708 Pine street. At the time of the poisoning of Cunningham, the defendant was employed by Mr. McLean and Rev. Dr. Short, rector of St. Peter's church, to do the yard work. She testified that on Tuesday, about two weeks before the poisoning of deceased, he brought a basket of mushrooms to Mrs. McLean. Mrs. McLean was absent but he left them for her. The defendant was sitting in the laundry, where witness was ironing and saw the mushrooms, and deceased asked him if Dr. Short liked mushrooms and he said he did not know.

George Davis, coachman and houseman for Mr. Amadee Cole, testified he knew defendant; that in July previous to the poisoning the defendant came to where witness was scrubbing the sidewalk. Witness was deeply interested in the welfare of Duncan, and he gave defendant the newspaper and said, '' Look over the paper and see how Duncan stands.'' ''He read the paper and after he got through he said, 'I been down town to-day on a little errand, and I got defeated in what I was going to do.' When asked how, he said, 'I went down to the drug store; aimed to get some strychnine.' He said, 'You are well acquainted down there; couldn't you do that for me?' I says, 'No. You better let that alone; you'll get yourself into trouble. The best thing you can do is to let that go,' and asked, 'what did you want with it?' He said he was going to poison a dog. He said the dog bit some little girl where he worked and he wanted to poison the dog and not let his boss know

how it got killed, so if it died around the house he wouldn't know anything about it. He said he was working either at McLean's or Dr. Short's; can't remember now, but one or the other." Witness told him he wouldn't get the poison for $1,000. Defendant said he could do it if he would. Possibly a week before this defendant had told him he had been beaten out of his job and didn't like it. On the evening of the poisoning witness met defendant near 6 o'clock and stopped him and said: "That is too bad; two gentlemen were poisoned at the church, one was dead and the other nearly so. And he merely answered, 'Yes,' and walked on." Usually he had always stopped and talked.

Dr. C. A. Frank testified that he held a post-mortem examination upon body of deceased. His death was caused by poison. He took out the stomach, liver, brain, and kidneys and placed them in a jar and hermetically sealed it and turned them over to the coroner.

I. N. Frank testified he turned over the same jar hermetically sealed, together with a piece of cheese received by him from the police department to C. R. Sanger, a professor of chemistry in Washington University.

Professor Sanger testified to having received the jar and its contents. He subjected both the cheese and the contents of the stomach to five different analyses during a period of three weeks and he discovered in a piece of cheese weighing five sixths of an ounce a proportion of three tenths of a grain of strychnine to the ounce. His analysis revealed strychnine in the stomach sufficient to account for death by strychnine poison.

Dr. I. N. Love testified that all the indications in Beckett's case pointed to strychnine poisoning. He

had not a shadow of a doubt on that subject. He also testified that seeing the baskets and the remains of the lunch there he directed someone to take charge of it and turn it over to the police, for he felt it was most important evidence.

John Berry, a policeman, testified that St. Peter's church was on his beat; that he went to the church about 5 o'clock of the evening of the poisoning. That he gathered up the fragments of the lunch, the basket and bottle, and brought them to the police office of the fifth district. Identified the articles in evidence as the same.

E. Schmidt, a grocer at 3562 Olive street, testified that his store was two blocks from St. Peter's church. He knew Dr. Short, rector of said church. He remembered the occurrence of the poisoning. He had known George Thompson, the defendant, two or three years at that time. About noon of the day deceased was poisoned defendant came into his store and asked the price of a bottle of beer. He said he only wanted a single bottle. "I told him it was ten cents a bottle or three for a quarter. He went out for a little while. He studied about it awhile and came back in a few minutes and said he wanted a bottle of beer. I asked him what kind. The defendant said, 'The same kind that Mrs. Reverend Short gets.' I told him I didn't know what kind she had been getting. He said, ' She got it here at this store.'" He told him she had not been trading there and didn't know what kind he wanted. The defendant then said "Anheuser-Busch." The grocer thereupon gave him a pint bottle of dark Anheuser-Busch and defendant handed him a quarter and he gave him fifteen cents in change and he went out. Defendant appeared excited or confused. Didn't seem to know what he wanted to say. Identified the bottle in evidence as the kind he sold him, but said it

had a rubber cork when he sold it.   He identified the prisoner as the purchaser of the beer beyond any question.

Leo Rüchersfelt testified he was a druggist at 3695 Laclede avenue, two blocks from St. Peter's church. On the twenty-sixth of September, 1894, three days before the poisoning, he received a written order purporting to come from Dr. Keber for a drachm of sulphate of strychnine. A negro man brought it.   He could not say that he had ever seen the negro since. Believing it a genuine order he gave the negro the drachm of strychnine for Dr. Keber.   There were forty-five or fifty fatal doses in the amount he sent.   "I did not know Dr. Keber personally but knew there was such a physician on Pine street.   I marked the order 9–26–'94, and signed my own name.   I delivered this order to Mr. Gocking, a detective, the Monday following the poisoning."   Witness identified the paper in evidence.

Dr. Keber testified he had resided at 3832 Pine street seven years.   He pronounced the order a forgery of his name.   He never gave it nor authorized it.   He had no negro man in his service.   Did not know defendant.

Nettie Simon testified that she worked at the Grand avenue bakery, on Grand avenue and Olive street. Remembered the poisoning of Mr. Cunningham, the sexton.   Heard of it the day it happened.   About noon of that Saturday she sold two charlotte russe to a negro man.   He threw down a dime and went out in a hurry.   She sold a dozen charlotte russe to a lady that afternoon about 5 o'clock, and that was all she sold that day of charlotte russe.   She identified the paper in the basket as of the kind in which she put up the charlotte russe she sold the negro man, and the box.

Joseph Gocking, special police officer, testified he was detailed on this case about 6:30 the evening of the poisoning, with officer Harrington.   They received the basket and remnants of the lunch that evening and locked them up and they have remained locked up ever since, except a part of the cheese furnished Prof. Sanger for analysis.   He found the paper and piece of charlotte russe sticking to it in the furnace in the basement of the church.   He arrested defendant.   Defendant said that night he had not bought any crackers or beer.   Next day he admitted he had, but gave them to a friend that was going away.   Identified letters "B. & C." and the order on Ruchersfelt.   He identified a blue jumper shirt, and a hat which he found and took in the basement of Dr. Short's residence.   He said defendant told him where he could find it.

Michael O'Malley testified that he was a member of, and a captain in, the police force of St. Louis, and had been for twenty years.   Was captain in fifth district in September, 1894.   St. Peter's church was in his district.   He saw the defendant write the letter to Mr. Beckett, the organist.   The letter is known in the record as exhibit "E" and the envelope as "F."   He also saw him write the note marked and known in the record as exhibit "G" to Rev. Dr. William Short, also one to Charity Thompson, 3718 Morgan street.   This letter is marked exhibit "I" and the envelope "H."   He had a conversation with defendant in which defendant denied being around St. Peter's church the day of the poisoning, but finally said he saw Cunningham about half past 4 sprinkling the lawn.   The prisoner denied *in toto* the story about his being present at McLean's when deceased brought her some mushrooms. Said he did not know what they were, never saw any.

On cross-examination this witness (O'Malley) stated that when he learned of an anonymous letter written to Cunningham he said: "I will go and get his handwriting, so as to compare it with this letter, and I took him in paper and told him to write a letter. He said he would write one to Dr. Short. I asked him who he wanted to write to. He said to Dr. Short and one to his wife, and I gave him the paper and he wrote those letters. I wanted to get his handwriting to compare with the anonymous letter."

The superscription on the envelope to Mr. Beckett was in these words:

'(Exhibit "E") "Mr. Beckett,

"Organist,

"St. Peter's church,

"Lindell and Spring Ave."

The letter to Beckett, excepting the printing, was in these words:

(Exhibit "F")

"Office of Police District.

"ST. LOUIS, Oct. 1st, 1894.

"Mr. Beckett me dear sir i know of no one having no ill feeling towards you or mr cunningham nor I dont know anything about the basket an i dont know who brought the basket to the church.

(Signed) "GEO. THOMPSON."

The letter to Dr. Short, exhibit "G," was in pencil as follows:

"Dr dear sir will you come to see me at once as i am anxious to see you. Your obedient servant

"GEO. THOMPSON."

Addressed "Rev. Wm. Short,

"3694, West Pine Street."

The letter to Charity Thompson, exhibits "H" and "I" was directed:

"Charity Thompson,
"3718 Morgan St.,
"City."

and in these words:

"Oct. 1st, 1894.

"Charity i hope you are doing well you may come to see me at once if you like to an thinks it not too early for you to come out i wants to see you verry bad i wants to see mr whitiour an edd goodloe at once edd hawkins also charlie an mr woods you may bring me something to eat if you like to they are not starving me out here.          GEORGE THOMPSON."

"Charity dear wife. i i hope you are getting well. i also hope you are not in grief. mr short will come to see me at once i hope, i hope baby is well an not so fretful as have ben i were so afraid you would try to come to see me today an make yourself sick remember me in Prayer for my trust is in the Lord. Mr and Mrs rev Short has ben to see you i guess an so has mrs mclean never did i think dear that i would come to be locked in Prison but i am inocent an tries to make my self satisfied good by Georg Thompson Charity Thompson 3718 Morgan"

Exhibit "A" was in these words:

"Please send by bearer one 1 ℨ (1 dram) of strychnine and oblige,

"DR. KEBBER, 3832 Pine St."

Exhibit "B" was in these words:

"Beckard Choir Master St. Peter's Church, Lindell and Spring ave."

Postmarked, "St. Louis, Aug. 2, 11 p. m. 94"

State v. Thompson.

Exhibit "C" was as follows:·

"AUG. 2nd 1894."

"My dear Beckard i am sorry o sorry indeed to say to you that the music commite is so dissatisfied with you undertaking to play their grand new organ as they call it as a friend to you i must say that there will most certainly be a change made some are saying you knows nothing about playing an organ while a balance says you cant even. play a piana i felt so bad over this felt it my duty to give you an understanding of what they are going to do now i must say to you of that i know you have a finer choir in st peters church now than ever she were known to have i have heard men who know all about music say that they would not wish a better organist and the training of your choir they have said to me were magnifficient Beckard you are not an organ maker to suit evy ones preferance to to the sound of the organ so if i were you i would let them persue their coarse for all you may do now will by counted nothing i have worried with this commitee time anagain asking them to be contented saying saying to them that we can not get a more faithful worker than you are their reply were you know nothing some replyed you knew to much about music an not enough about farming some saying they had heard enough of your smart talk the first begining of all this rumor came from that low irish Joe the sexton there of the church 3 or 4 of the gentlemen of the music committee came in the church quite a good while ago. one asked had or did you do any practiceing so he spoke up an said you were tramping around in the church the best part of your time an one half of your time you had some one to teach you how to play the organ an it soon reach the committe an from one word to another they said Joe were about right an were sensible to notice such thing an not long since he

told some one of the vestry agretdeal you should said about no one in st peters church should not impose on you an you did not care whether you played the organ right or wrong for you got no credit either way thought the transactions of our business i have found that Joe both a tadling liear an hypocrit will have a good talk with you after the next meeting will also come verry near getting rid of the mr Joe should be atending to the cleaning of the church and the yard it would not look so much like a pastor for cattle or some place for rent instead of seeing after your business Yours Resp will not give name but will see farther i will make every efford to get rid of Mr Joe for his interfearing"

W. L. Fitzgerald was called and qualified as an expert and shown all of said exhibits and requested to compare exhibits "B" and "C" above with exhibits "F," "G," "H," and "I" and to state if they were in the same handwriting, and he gave his opinion they were and exhibit "A" with exhibit "G" and he testified they were written by same party.

Thereupon the state offered all of said exhibits, letters, envelopes, and notes in evidence, to the introduction of which in evidence defendant by his counsel objected, *first*, because the inclosure shows that exhibits E, F, G, H, and I were obtained by fraud and deceit after the defendant had been arrested and incarcerated for the purpose of using them in evidence against the said defendant and for the purpose of compelling him to manufacture evidence against himself; *second*, they were objected to because the exhibits, viz. E, F, G, H, and I, are not in any way connected with the case but are wholly irrelevant writings attempted to be introduced solely for the purpose of comparison. There being no statute in this state providing for the admission of handwriting for the purpose of comparison, the Missouri supreme court have uniformly

followed the rule of the common law, the generul rule
of which is that handwritings are inadmissible for the
purpose of comparison, this general rule admitting
of two exceptions, viz.: writings already in the case
for some other purpose than of comparison and when
the party is estopped to deny their genuineness or admit
their genuineness in open court.   Which objections the
court overruled and admitted all of said exhibits in
connection with the evidence of said Fitzgerald to
which ruling defendant at the time by his counsel
duly excepted.

Defense.

Rev. Dr. Short testified that defendant's reputa-
tion was good prior to this charge.   He corroborated
the state's witnesses as to the blue jacket of defendant
found at his house, the dishes, and to requesting the
officers to preserve the remnants of the lunch and that
Mrs. McLean was a member of his church, and that
defendant was discharged because the vestry preferred
a white man for sexton when they moved to the new
church, and Cunningham took defendant's place.

Miss Susan Knox Gordon testified the defendant's
general reputation was good for two years before she
employed him at her residence, 4044 Westminster
Place, in February, 1894.

Thomas H. Smith, formerly choir master at St.
Peter's church, testified to good character of defendant.

P. B. Pitman, barber at 3406 Olive, testified to
good character of defendant and bad reputation of
George Davis, witness for the state.

Charles Thompson, waiter at West End Hotel,
cousin of defendant, testified to the good character of
defendant and bad reputation of George Davis.

The wife of defendant testified that the hat pro-
duced by the state and identified by officer Gocking as
having been found by him in the basement at Dr.

Short's was taken from her home by the officer; that she gave it to him.

Noah Whitus testified the officers came to his house on the day of the arrest of defendant and took away a glass dish, but one totally unlike those in evidence.

Defendant in his own behalf testified that he lived at 3718 Morgan street. On the morning of September 29, 1894, he left his home about 6 o'clock and went to the residence of Rev. Wm. Short, rector of St. Peter's church. He remained there until 8:30 that morning. From Dr. Short's he went directly to the residence of Mrs. Thomas McLean and remained there at work until a quarter past 12. He then went home to lunch and returned to Dr. Short's about 2 or 2:15 P. M. and was there continuously until a quarter to 5 o'clock that evening. In going home for lunch he passed St. Peter's church, going on Spring avenue, and coming back he also passed the church.

The court instructed the jury on murder in the first degree, on reasonable doubt, on alibi, on credibility of the witnesses, testimony of experts, and indeed upon every question of law properly in the case. It refused certain instructions for defendant because it had already prepared and given them in substance in its other instructions.

During the argument Mr. Zachritz, the circuit attorney, in his closing argument for the state, among other things, said: "No one knows who took that lunch to the deceased except George Thompson, the defendant, and the deceased, Joseph Cunningham. Cunningham is dead and can't tell. Cunningham did tell! But the court has held that incompetent and I won't discuss it further." The court of its own motion rebuked the circuit attorney, in the presence of the jury, telling him such remarks were improper, and thereupon the circuit attorney withdrew said remarks

and asked the jury not to consider them.   Later on in his argument the circuit attorney turned and facing the defendant, said:   "George Thompson, I can't see how you can sit there like a stone and see this poor widow and not be moved.   Hanging is too good for you.   You ought to have been taken out and, in the presence of your wife and baby, have your neck broke!" Again the court interfered and said:   "Mr. Zachritz, it is not proper to abuse the defendant.   Please confine your remarks to the evidence," to which the circuit attorney replied:  "Yes, your honor, a man gets excited."   No exception was saved to either of these remarks or to the failure of the court to rebuke the circuit attorney more severely.

The jury returned a verdict of guilty of murder in the first degree.

In due time motions in arrest and for new trial were filed and overruled and defendant was sentenced to be hung, from which judgment he appeals.

Numerous assignments of error appear in the brief of counsel for defendant.   As the case involves the life of the defendant we have patiently scanned each line of the evidence and reviewed every step in the proceeding which culminated in his conviction.

I.   There was no error in refusing the continuances.   The witness, Lizzie Harding, on account of whose absence defendant sought the first continuance, was in the court room when the application was overruled and a special opportunity was afforded defendant to call this witness and it was declined.   Such an application was trifling with the court.   Neither was there any diligence whatever shown in the effort to obtain G. M. Lewis, nor was the five days of quarantine for fear of smallpox a sufficient showing for any further delay in the case.   The court was exceedingly liberal in giving time for preparation for the trial.

II.   The objection to Professor Sanger's testimony relating to the chemical analysis of the cheese and the contents of the jar containing the stomach, kidneys, etc., of the deceased is based solely upon the proposition that the jar in which the physician, Dr. Frank, who made the post-mortem, placed the stomach, kidneys, etc., was not hermetically sealed; that it is not sufficient that it should appear as it did in this case beyond all controversy that Dr. Frank made the post-mortem examination of the body of the deceased; that he took out the stomach, liver, brain, and kidneys and placed them in a jar, sealed it and turned the jar over to the coroner of the city and that the coroner in turn turned over the same jar still sealed to Professor Sanger and that Professor Sanger made the analyses himself of these parts, which were all the time in his exclusive possession and his own control.   We are cited to Wharton & Stille's Medical Jurisprudence as authority for the extreme position taken by the learned counsel for defendant, but, as we supposed, the text does not support the contention.

In section 4, volume 2, Wharton & Stille's Medical Jurisprudence, it is said, "The physician in attendance, * * * where there is the slightest suspicion of poisoning [should] take charge of everything which may by any possibility throw light upon the cause of the illness, such as all vomitus and excreta * * *, bottles of medicine, powders, and any article of food * * *; all of these substances should be carefully preserved by being placed in clean glass vessels * * * by the physician himself, sealed, and kept under lock and key until wanted."

Every precaution here suggested was taken in this case, but it did not require these substances to be "hermetically sealed." It needs no argument or authority to establish that the burden is upon the party rely-

ing upon a chemical analysis to detect poison to satisfy the court and jury of the identity of the body examined with that which he asserts was poisoned. This fact like any other must depend upon the precautions taken. Certainly we agree with the learned counsel that the physician making the post-mortem can not be too careful in seeing that the parts he desires analyzed should be carefully separated to themselves and so kept as to silence any suspicion or doubt, but it may often happen that the proof is entirely satisfactory that the part or parts reserved for the analysis have never been tampered with by any one whose interest might lead him to destroy or alter them and though not hermetically sealed, the analysis would not for this reason be rejected. In this case the evidence did not create a suspicion that the parts received by Prof. Sanger for his analysis were other than those preserved by Dr. Frank. The court committed no error in this regard either as to the contents of the stomach or the analysis of the cheese. Considering the circumstances, unusual care was taken to preserve the evidence by the officers, physicians, and the rector of the church.

III. Among other things it is urged that the court erred in admitting statements made by the deceased as a part of the *res gestae* after he had left the place where the poisoning is alleged to have occurred.

We are not certain that we fully grasp this objection for the reason that deceased never left the church in which he was poisoned nor the presence of the organist who was poisoned by the same lunch, more than a minute, and that was to follow him and with him compare notes of their condition. This brings us to consider what was the *res gestae* of the poisoning.

When the organist was on the stand the circuit attorney asked him if he knew how the lunch came

there, or who brought it there, and if deceased made any statement, as they went to the lunch or while eating it, as to where it came from. To this defendant objected and the court having sent the jury to their room, the witness answered, "that while we were eating the lunch deceased was telling me that his lunch had been sent to him; that Mrs. McLean had sent it by her hired man." The trial court excluded this statement by the deceased, and the state duly excepted.

"The *res gestae* may be, therefore, defined," says Dr. Wharton, "as those circumstances which are the automatic and undesigned incidents of a particular litigated act, and which are admissible when illustrative of such act. These incidents may be separated from the act by a lapse of time more or less appreciable. They may consist, as we will see, of sayings and doings of anyone absorbed in the event, whether participant or bystander; they may comprise things left undone as well as things done. *   *   *  In other words, they must stand in immediate causal relation to the act,—a relation not broken by the interposition of voluntary individual wariness, seeking to manufacture evidence for itself." 1 Wharton's Law of Evidence, sec. 259.

This statement of the general rule has received the indorsements of the supreme court of New Jersey in *Hunter v. State*, 40 N. J. L. 495, and of Pennsylvania in *Com. v. Werntz*, 29 Atl. Rep. 272, and by this court in various connections. In the very nature of things the *res gestae* must vary as the facts of each case vary. It is not possible to bring this class of cases within a more specific description, however much judges and law writers criticise the indefinite statement of the principle. The criticisms have proven as unsatisfactory as the texts which they have assailed.

The *corpus delicti* in this case consisted of the death

of Cunningham by poison, and the criminal agency of defendant in administering it to the deceased.

We have no doubt whatever of the admissibility of the statements made by the deceased and the organist concerning their physical sufferings and feelings when they were both suffering from the effects of the poison.

The more serious question arises upon the action of the learned judge in excluding the statements of the deceased as to how and from whom he obtained the lunch as they were eating it. The theory of the state, we presume, in the absence of a brief, was that this statement of the deceased was most pertinent to the main issue in that it tended to establish defendant as the guilty agent in placing the concealed poison in the hands of the deceased; that the act of giving the lunch to the deceased was accompanied with the false and seductive statement that it had been sent to deceased by Mrs. McLean, a member of the congregation; that the statement was a most natural one for deceased to make to the organist if he had in truth so received it from defendant, and moreover it gave a reason and motive for the presence of defendant in the church yard when seen there by the witness Waitz about 2 o'clock that afternoon.

That the deceased could have had no motive to deceive the organist and destroy his life is apparent from his own conduct in partaking so heartily of the poisoned food himself; that it was contemporaneous in that he was innocently engaged at the very time in administering the poison to himself as it was designed he should. His statement characterized his conduct and furnished a motive for eating the food in the lunch, because he felt it was a compliment and a kindness on the part of Mrs. McLean, whereas if defendant, who was under no obligation to deceased, had brought him the lunch, or if some stranger had done so, it might

have caused an ordinarily prudent man to suspect some criminal purpose. On the other hand, it might be argued that some men are prone to boast of attentions and kindnesses which they assert are shown them by those of superior social or civil position and that deceased might have desired to impress the organist with his popularity among the members of the congregation, but these are considerations for the jury to weigh, accordingly as deceased might be shown to be of that disposition or character, and do not affect the competency of the evidence.

As the law now permits the accused to testify, the reason for the rigid exclusion of evidence like this has been greatly shaken. Even Lord Chief Justice COCKBURN, whose ruling in *Bedingfield's* case was at variance with many English and American precedents on this question, and has been rejected both by our courts and law writers, conceded that if the prisoner could testify the rule should be relaxed.

Certain it is that the rulings of our own courts insure much valuable evidence to aid the courts and juries in determining the issues submitted to them which the rigid enforcement of the hearsay rule would exclude. As said by Chief Justice COCKBURN in *Regina v. Church Wardens of Birmingham*, 1 Best & Smith (E. C. L.) 763, "People were formerly frightened out of their wits about admitting evidence, lest juries should go wrong. In modern times we admit the evidence, and discuss its weight." (*Loc. cit.* 767.) We think the statement of the deceased should have been admitted as a part of the *res gestae*.

IV. The criminal court admitted the letters written by the defendant to his wife and to the Rev. Dr. Short after his arrest, together with proof of their genuineness for the sole purpose of making them the basis of comparison with the disputed anonymous letters

written to the organist and containing a covert threat against deceased and for comparison with the forged order on the druggist for the drachm of strychnine. These letters were wholly irrelevant to any issue in the case. They did not tend to prove or disprove the guilt or innocence of defendant. The one to his wife was purely personal and the other simply requested his employer to call upon him. That to the organist simply asserted he knew of no person who desired to injure him and asserted his own innocence of the charge upon which he was incarcerated.

Under repeated adjudications of this court it has been ruled that unless writings are in evidence for some legitimate purpose in the case and are admitted to be in the genuine handwriting of the party or he is estopped from denying their genuineness they can not be admitted for the purpose of comparison with disputed writings or for the purpose of proving the handwriting of a party.

The court therefore erred in admitting the letters written by defendant while in jail to his wife, the organist, and Rev. Dr. Short, as they were offered for the sole purpose of furnishing specimens of defendant's handwriting and thus furnish a basis for a comparison thereof with the order for the poison and the threats against the sexton. *State v. Minton*, 116 Mo. 605; *Rose v. Bank*, 91 Mo. 399; *Doe dem Perry v. Newton*, 5 A. & E. 514; *Griffits v. Ivery*, 11 A. & E. 322.

Since the trial of this case the legislature has added a new section to chapter 173 of Revised Statutes of 1889 to be known as section 8944a which provides that "comparison of a disputed writing with any writing proved to the satisfaction of the judge to be genuine shall be permitted to be made by witnesses, and such writings and the evidence of witnesses respecting the same may be submitted to the court and jury as evi-

dence of the genuineness or otherwise of the writing in dispute.'' Laws of 1895, p. 284.

V. The instructions were unobjectionable, and covered the whole case, and every proposition of law involved.

VI. The remarks of the prosecuting attorney were highly improper. The court very properly rebuked him in the presence of the jury, but no exceptions were saved to them by defendant's counsel.

As the cause must be reversed for the improper admission of the letters in evidence and a comparison thereof with the disputed writings tending to prove the purchase of the poison and the threats, it is unnecessary to pass upon the separation of the jury. For the error noted, the judgment is reversed and cause remanded. SHERWOOD and BURGESS, JJ., concur.