Submitted on briefs May 24, reversed and remanded July 5, 1921.

## KELTY v. FISHER ET AL.

(199 Pac. 188.)

**Negligence—Evidence of Other Acts Ordinarily Inadmissible.**

1. Evidence as to collateral facts which do not afford any reasonable inference as to the fact in issue are inadmissible, and, for that reason, in a negligence case, evidence of other negligence is ordinarily inadmissible.

**Physicians and Surgeons—Where Doctor Ordered Two Patients Treated Alike, Giving of Morphine to One is Admissible to Show it was Administered to the Other.**

2. In two proceedings on claims by a physician against the estates of deceased patients who were taken the same day with influenza, and who stayed in the same room and died practically at the same time, where the administrators of one of the decedents contended that the physician negligently gave his intestate morphine, instead of a heart stimulant, evidence that the physician gave the other patient morphine was admissible.

**Physicians and Surgeons—Instruction on Duty of Physician Erroneous.**

3. In an action by a physician for services rendered to a decedent, where the defense was negligence, a requested instruction that it is the duty of a physician to disclose to relatives of the patient the true condition, and, if he should fail in this duty and inform the relatives that the patient was not in a dangerous condition when in truth he was, the physician would be guilty of negligence precluding recovery of compensation, was properly refused; for, though the jury should find that the physician exercised all possible care, they would be required to find against him if, believing that his patient was dangerously sick, he told relatives he was not in a dangerous condition.

**Appeal and Error—Fact Questions are for the Jury.**

4. It is the province of the jury, not the appellate court, to determine fact questions.

From Lake: GEORGE G. BINGHAM, Judge.

In Banc.

This proceeding involves a claim presented to and rejected by the administrators of an estate. H. E. Kelty is a regularly licensed physician and surgeon and resides in Lakeview. Johnnie B. Fisher and George W. Syron were half-brothers and they resided near Adel and about 32 miles from Lakeview. On February 12, 1920, Johnnie B. Fisher and George W. Syron became sick with influenza and according to the testimony of Clay T. Fisher, a full brother of Johnnie B. Fisher and a half-brother of George W. Syron, "Johnnie took sick in the morning and George in the evening." The sick men went to bed and Clay Fisher says "they had pains and there was a high fever." For the sake of brevity we shall refer to Johnnie B. Fisher as Johnnie and to Clay T. Fisher as Clay.

The Fisher brothers and Syron were living in "a temporary residence" which had a single room; and this room was about 10x14 feet in size. For convenience we shall call this temporary residence the Fisher house. Clay had been previously sick with the influenza and "was just getting over the flu," and he

took care of his brother and half-brother; but no other person was about the premises except Roy Godfrey who "was feeding sheep for Fisher brothers." On February 14th Clay sent for a doctor who visited and prescribed for the sick men; but Clay was not satisfied with the services rendered by the first doctor and for that reason on February 17th or 18th he sent for Dr. Kelty.

When Kelty arrived he found the two sick men in bed in the Fisher house; and according to the testimony of Kelty:

"The two were sick in this room—very sick at the time I arrived—had been sick for several days. * * and they were typical flu with pneumonia."

Clay says that Kelty examined the two sick men and left some medicine with directions, and that the doctor prescribed the "same kind of treatment" for both patients; and Clay declares that he followed the directions given to him. Dr. Kelty made either one or two more trips from Lakeview; it is probable that he made two more trips, for both Kelty and Clay say that three trips were made by the doctor.

On the last visit Kelty arrived at the Fisher house at about 9 o'clock Friday night, February 20th. As already explained the Fisher house contains but a single room; and since there were no sleeping accommodations for Dr. Kelty he left the Fisher house at 11 P. M and "went back to Wibel's" to stay overnight. Although no witness undertook to explain about "Wibel's" we infer from the record that Wibel was the name of a person who occupied a private residence or conducted a hotel at or near Adel and about two miles distant from the Fisher house. At some time between 2 and 3 o'clock in the morning of Saturday, February 21st, both Johnnie and Syron became worse, and Clay sent to "Wibel's"

for Dr. Kelty who immediately responded by coming to the Fisher house and attending to the patients.

Johnnie died on Saturday, February 21st, at about 10 A. M. and Syron died Sunday, February 22d, at 3 A. M.

Clay and S. O. Cressler were appointed administrators of the estate of Johnnie B. Fisher, deceased, and they were also appointed administrators of the estate of George W. Syron, deceased.

Kelty presented a claim to the administrators of the Fisher estate for medical services rendered Johnnie B. Fisher. The administrators of the Fisher estate rejected the claim. Kelty then presented the claim to the county judge who allowed $237.50 on the claim; and thereupon the administrators appealed to the Circuit Court. A trial by jury in the Circuit Court resulted in a verdict and judgment for the claimant for $175 and thereupon the administrators of the Fisher estate appealed to this court.

Kelty also presented to the administrators of the Syron estate a claim for $300 for medical services rendered George W. Syron. The administrators of the Syron estate rejected the claim. Upon presentation of the claim to the County Court an order was made allowing the claimant $237.50, and the administrators appealed to the Circuit Court. A judgment was rendered in the Circuit Court in favor of the claimant in the sum of $175 and the administrators appealed to this court.

The instant appeal involves only the judgment against the Fisher estate.

REVERSED AND REMANDED.

For appellants there was a brief by *Mr. O. M. Corkins.*

For respondent there was a brief by *Messrs. Hay & Gibbs.*

HARRIS, J.—The claim against the Fisher estate and the claim against the Syron estate were ready for trial in the Circuit Court on December 17, 1920, and because of the circumstances connected with the claims an attempt was made to enter into an oral stipulation providing for the disposition of the two cases by one trial. The attorneys for the administrators understood that they had stipulated for the consolidation of the cases and that under such stipulation all the facts connected with the two cases could be shown in the single trial; but the attorneys for the claimant understood that they had stipulated that the claim against the Fisher estate should be tried alone and by itself and that whatever verdict might be rendered in the Fisher case should be adopted as a verdict in the Syron case (*Kelty* v. *Fisher, post,* p. 110 [199 Pac. 192]). The court had the same understanding of the stipulation as was had by the attorneys for the claimant, and for that reason the court ruled that the claim against the Fisher estate should be tried alone and that whatever verdict might be reached on the claim against the Fisher estate should be adopted as a verdict rendered on the claim against the Syron estate.

The administrators rejected the claim against the Fisher estate on the ground that Dr. Kelty was guilty of negligence when treating Johnnie and the claim against the Syron estate was rejected for the same reason. Upon the trial of the claim against the Fisher estate the administrators contended that at about 11 o'clock Friday night Dr. Kelty negligently gave to Johnnie a hypodermic injection of morphine

and that this caused the death of the patient. Dr. Kelty insisted that, in violation of his instructions, Johnnie had been permitted to get out of bed and that this aggravated and made still more serious the already serious condition of the sick man. Dr. Kelty insisted that if he gave a hypodermic injection of any medicine at all on Friday night he administered camphorated oil, a heart stimulant, and not morphine or any other opiate. In order to support their contention that morphine was administered to Johnnie on Friday night the administrators introduced evidence of the symptoms manifested by Johnnie both before and after Friday night. As already explained Johnnie and Syron became sick with the same disease and on the same day. Each was confined to a bed and the two beds were in the same room. When Kelty made his first visit he examined the two sick men ''and they were typical flu with pneumonia.'' Clay testified that both of the sick men were ''resting easily'' when Dr. Kelty arrived Friday night. There was also testimony to the effect that Dr. Kelty made encouraging statements concerning the condition of the patients; and Clay and his mother say that the statements made by Dr. Kelty were calculated to make them believe that the patients were not seriously sick. Although the administrators were permitted without objection to show the condition of Syron up to and until the arrival of Dr. Kelty on Friday night and to show that Syron died Sunday morning, they were not permitted to introduce evidence concerning the treatment given Syron on Friday night; nor were they permitted to introduce evidence showing the symptoms manifested by Syron subsequent to the arrival of the doctor on that night. The ruling of the trial court was made upon the theory that the

Syron case was an entirely different case and that the facts connected with that case were not relevant to the Fisher case, which was the only case then on trial. Before inquiring into the correctness of the ruling we should first examine the evidence concerning the treatment of Johnnie and the symptoms subsequently shown by him.

Clay testified that he put his hand on Johnnie's head on Friday before the arrival of the doctor and that "his head was cool"; and that when the doctor arrived "he told me his temperature was below normal." In other words, the administrators claimed that Johnnie was, at the time of the arrival of the doctor on Friday, without fever and resting easily with good prospects for recovery. Clay declared that the doctor gave Johnnie a hypodermic injection and that "quick as he gave it to him he went to sleep, fell back to sleep and was kind of snoring, breathing easy"; that Johnnie slept about two hours when he awoke; that "he was restless at the time he first woke up and he said he believed he was poisoned and in a few minutes after he was suffering intense pain"; that "he was breathing fast and groaning with every breath"; that his suffering "continued until he died"; and that the doctor gave Johnnie "another hypodermic, he said it was morphine and he needed it—that is when he died."

A witness called as an expert testified that the symptoms manifested by Johnnie after the alleged hypodermic injection suggest the fact that perhaps some opiate had been given. Clay not only declared positively that a hypodermic injection was administered but he also described the appearance of the substance used and told about what the doctor did with the substance when making it ready for use.

The administrators attempted but the court refused to permit them to introduce evidence tending to show that "Dr. Kelty said he was going to give morphine" to Syron; that Syron "did drop off to sleep immediately" after the doctor administered a hypodermic injection; that Syron slept about two hours; that after Syron awoke he "complained of great agonizing pain and suffering"; and that "this suffering did continue until the death of George Syron." The administrators complain because of the refusal of the trial court to receive evidence concerning the symptoms manifested by Syron. In our view the proffered evidence should have been received.

1. Stated in general terms the established rule is that upon the trial of a lawsuit the evidence must be confined to the question or questions in issue. This rule when applied generally excludes evidence of collateral facts and facts which do not afford any reasonable inference as to the fact in issue; and hence evidence of other similar acts of a party or of those of a stranger to the litigation or of occurrences having no connection with the act or event in controversy, is generally inadmissible: 11 Ency. of Ev. 770. For example, in an action for the negligent use of an X-ray machine, evidence that the defendant had on other and different occasions injured other patients by his treatment was held to be inadmissible: 30 Cyc. 1587; *Shockley* v. *Tucker*, 127 Iowa, 456 (103 N. W. 360). In the precedent last cited the proffered evidence related to different and independent cases which had no connection whatever with the case in controversy; and manifestly the evidence concerning the other cases was inadmissible. However, this general rule which excludes evidence of similar acts has its exceptions: 11 Ency. of Ev. 774; 22 C. J. 746.

2. The fact that the evidence is upon a collateral issue is not always conclusive against its admissibility. One of the inquiries always to be made is: Does the fact which the offered evidence tends to establish prove or disprove the fact in issue? In *Remy* v. *Olds,* 4 Cal. Unrep. 240 (34 Pac. 216, 21 L. R. A. 645), it was aptly stated:

"Evidence is relevant not only when it tends to prove or disprove the precise fact in issue, but when it tends to establish a fact from which the existence or nonexistence of the fact in issue can be directly inferred."

In 22 C. J. 744, it is said:

"The admissibility of the evidence, so far as relevancy itself is concerned, varies with the ratio of danger and advantage, increasing as relevancy grows stronger, and as the probability that other and better evidence is procurable or that the jury will be misled by the evidence offered grows weaker, and diminishing in turn, as relevancy grows weaker, and as the probability of procuring better evidence or that the jury may be misled increases."

If the Syron case be considered as a separate case, nevertheless, if the evidence offered by the administrators is true, the conditions and circumstances of that case were so much like the conditions and circumstances attending the Fisher case as to make the two cases practically identical. The two men became sick on the same day and with the same disease. They were confined in the same room and were cared for by the same person; the condition of each was the same when the claimant first visited them; the doctor prescribed the same treatment for them; and there is evidence to the effect that the two men were in the same condition when the doctor arrived Friday night.

The evidence attempted to be introduced by the administrators assuredly possesses probative value. The administrators are contending that the death of Johnnie was caused by the negligence of the doctor in giving a hypodermic injection of morphine. There is evidence in the record to the effect that it is dangerous to administer an opiate to a patient afflicted with influenza and pneumonia. The proper remedy, it is said, is one which stimulates and not one which retards action of the heart. Evidence was received showing the symptoms manifested by Johnnie and one witness testified that the described symptoms indicated that an opiate was the cause of those symptoms. The administrators attempted to show that the symptoms manifested by Syron were exactly like those manifested by Johnnie; and, furthermore, the administrators offered to show that the doctor stated before giving the hypodermic injection to Syron, that he was going to give Syron some morphine. The issue in this litigation is: Was or was not the claimant guilty of negligence in that he administered morphine instead of a heart stimulant? The inquiry is: What did the doctor give to the patient? The claimant declares that if he administered anything at all it was camphorated oil, a heart stimulant. The administrators assert that the doctor administered morphine. In the very nature of things the administrators must prove their contention, if they prove it at all, by showing the effects produced in the Johnnie B. Fisher case and by reasoning from the effects so shown back to the cause of those effects. Moreover, the two cases were so intimately connected as practically to constitute one case; and indeed upon the authority of some precedents, the medical treatment given to Syron and the symptoms manifested by him were a part of the

*res gestae.* However, whether the Syron case be treated as strictly a part of the *res gestae,* or merely as a similar case, the marked similarity of the circumstances and conditions obviously gives to evidence concerning the Syron case a distinctive probative value and a logical and legal relevancy; and hence our conclusion is that the administrators were entitled to introduce evidence concerning the Syron case; and this conclusion is in accordance with opinions expressed by text-writers and by judges in other jurisdictions: *Shea* v. *Glendale E. F. Co.,* 162 Mass. 463 (38 N. E. 1123); *State* v. *Isaacson,* 8 S. D. 69 (65 N. W. 430); *Epps* v. *State,* 102 Ind. 539 (1 N. E. 491); *State* v. *Thompson,* 132 Mo. 301 (34 S. W. 31); *Commonwealth* v. *Kennedy,* 170 Mass. 18 (48 N. E. 770); 11 Ency. of Ev. 814, 819; 1 Wigmore on Ev., § 457; 22 C. J. 746.

3. The administrators assign as error the refusal of the trial court to give the following requested instruction:

"I instruct you that it is the duty of a physician to disclose to the relatives of a patient who employ him to treat the case, when called upon by such relatives to state to them the true condition of the patient, to give them full, accurate and complete information as to the condition of the patient. If he should fail in this duty and should inform such relatives that the patient was not in a dangerous or serious condition, when in fact and in truth such patient was in a dangerous and serious condition, the physician would be guilty of such carelessness and negligence as to preclude him from receiving any pay for his services in case of the death of the patient. If you should believe in this case from a preponderance of the evidence that Dr. Kelty informed Clay Fisher and led him to believe that the patients, Johnnie B. Fisher and George W. Syron, were not dangerous that there was no occasion for getting another doctor and that

he would be able to get them up from their sickness, when in truth and in fact they were in a dangerous condition and he knew and considered them in a dangerous condition at the time such representations were made, then and in that event I instruct you that he would not be entitled to any fee whatever, and it would be your duty to return a verdict for the appellants.''

The mere reading of the requested instruction demonstrates the correctness of the view taken by the trial court. If the court had submitted the requested instruction to the jury, they would have been required to return a verdict for the administrators if they found merely that the doctor believed the two patients were dangerously sick and so believing told Clay that the two men were not dangerously sick; and the jury would have been required so to find for the administrators even though they might also have found that the doctor exercised the very highest degree of care and skill in the treatment of the patients and even though it was impossible to have done more than was done for them.

4. It must of course be understood that Dr. Kelty offered evidence contradicting the evidence submitted by the administrators; and it must not be understood from any statements appearing in this opinion that we entertain or express any opinion as to the merits of the controversy. It is the province of the jury to determine the facts from such competent evidence as is submitted to them. The administrators were entitled to show the facts and circumstances attending the Syron case; and it was prejudicial error to refuse to receive the evidence which the administrators offered concerning the treatment of Syron and the symptoms manifested by him. The judgment rendered in this, the Fisher case, is reversed and the cause is remanded for a new trial.

REVERSED AND REMANDED.