### DELAWARE, L. & W. R. CO. v. ASHLEY.

(Circuit Court of Appeals, Third Circuit. April 22, 1895.)

#### No. 2.

1. RAILROADS—PASSENGERS—VALIDITY OF RELEASE.

Plaintiff was employed by one J., a shipper of poultry in car-load lots, to travel with the cars of poultry, and care for the fowls. J. shipped, by the C. Ry. Co., a car of poultry, the bill of lading stipulating that the same should go to its destination via D., L. & W. from Buffalo, and that the man in charge should pass free, and the through waybill stating the same condition. Plaintiff accompanied the car. The D., L. & W. Ry. Co. received the car, with the waybill, and passed plaintiff free, but required him to sign a release of any claim for damages. Plaintiff was injured in an accident on the D., L. & W. road. *Held* that, the transportation of plaintiff having been part of the consideration of the contract with the initial railway company, plaintiff was a passenger for hire, and, the D., L. & W. Ry. Co. having been bound, if it accepted the car

and waybill, to carry plaintiff in accordance with such contract, his release was without consideration and invalid.

**2. SAME—NEGLIGENCE—QUESTION FOR JURY.**
The accident was caused by the breaking up of the freight train on which plaintiff was traveling into several parts, and their collision with each other. The cars had been inspected but a short time before the break occurred, and no defect discovered, but it was contended the inspection was superficial. One brakeman was on the engine and another in the caboose. The rules of the railway company provided that no brakeman should be allowed to leave his post while the train was in motion, that conductors must see that brakemen did not remain in the caboose, and that brakemen must not ride on the engines. *Held*, that there was sufficient evidence of negligence on the part of defendant to go to the jury.

**3. SAME—CONTRIBUTORY NEGLIGENCE.**
*Held*, further, that it could not be held, as matter of law, that plaintiff was guilty of contributory negligence in lying down in the caboose after the break occurred.

**4. EVIDENCE—RES GESTAE.**
*Held*, further, that it was not error to admit, as part of the res gestae, declarations of plaintiff as to how he came to be in the caboose, made after the accident happened, but while plaintiff was still lying in the caboose, and suffering acutely from the pain of his injuries.

**5. RAILROADS—DEGREE OF CARE REQUIRED.**
The court charged that the law does not exact from railroad companies all the care and diligence which can possibly be conceived, but does require, either upon freight or passenger trains, everything necessary to the security of the passenger, reasonably consistent with the business of the carrier, and that this rule applies irrespective of any distinction made by the company in the character of its trains, but that under it a passenger on a freight train acquiesces in all the usual incidents of a freight train managed by prudent men. *Held*, that this charge was as favorable as the defendant could ask.

In Error to the Circuit Court of the United States for the District of New Jersey.

This was an action by Thomas Ashley against the Delaware, Lackawanna & Western Railroad Company to recover damages for personal injuries. The plaintiff recovered a judgment in the circiut court. Defendant brings error. Affirmed.

Flavel McGee, for plaintiff in error.

John T. Griffiths and William T. Edwards, for defendant in error.

Before ACHESON and DALLAS, Circuit Judges, and BUFFING-TON, District Judge.

BUFFINGTON, District Judge. This case arises upon a writ of error sued out by the Delaware, Lackawanna & Western Railroad Company to reverse a judgment recovered against it by Thomas Ashley in the circuit court of the United States for the district of New Jersey for personal injuries. The facts of the case are these: Ashley, the plaintiff, resided in the state of Indiana, and was in the employ of one Jordan, of Indianapolis, who was a large shipper of car loads of poultry from that region to New York. For two years Ashley had accompanied such cars of poultry free of extra charge, and had fed and watered the fowls en route. On March 11, 1892, Jordan delivered to the Cleveland, Cincinnati, Chicago &

St. Louis Railway Company a car of live poultry for transportation to New York; the bill of lading stipulating, "Via D., L. & W. from Buffalo," and "Man in charge to pass free from Indianapolis," and the through waybill stating, "To go via D., L. & W. from Buffalo," and "Pass man in charge free from Indpls." The defendant company received the car with the accompanying waybill at Buffalo, and issued a permit to Ashley "to ride free on train with car 273,  *  *  * subject to the conditions this day signed by him," which conditions stipulated, inter alia, for a release to defendant for injury to person "while using said permit, even though such loss, injury, or damage should be caused by the negligence of the company or its agents." Between 5 and 6 o'clock on the evening of March 16th the train, a part of which the poultry car was, and consisting of locomotive, about 20 freight cars, and a caboose, and a crew of an engineer, fireman, three brakemen, a conductor, and a flagman, left Washington, N. J., where the cars were inspected, and from thence proceeded some three miles, to the Port Murray water station. Here it stopped for water. While passing through Ramsay's cut, a short distance beyond the water station, the caboose and two cars were found by those on board them to have parted from the forward part of the train. They were promptly stopped, and a flagman sent back, who flagged an approaching wildcat train, which was known to be following. The wildcat engine then pushed the caboose and freight cars out of the cut, so the trainmen could see and signal the forward part of the train when it returned to pick up the parted cars. The wildcat engine, with steam up, remained standing about 10 or 15 feet back of the caboose. The conductor and one of the brakemen went to the foremost car, to await the return of the forward part of the train. The flagman went into the caboose, and began making out his report, and Ashley, the plaintiff, came in, and lay down on one of the caboose bunks. The night was dark. The middle brakeman was on the rear of the train when the separation occurred, alleging that after leaving the water station he had come to the caboose to get his overcoat and rubbers, preparatory to going forward on the train to use the brakes on a descent beginning at Rockport summit. This was the situation about 7 o'clock on the rear portion of the train. The grade from Ramsay's cut to Rockport summit was rising, but not continuously so. It was broken at places by "sags" or depressions. As he was nearing the summit, the engineer failed to see the caboose light, and at once signaled for it. Receiving no response, and unable to see by reason of escaping steam, he slowed down, and sent back the forward brakeman, who was on the rear of the engine, to see the situation. In point of fact, two breaks had in the meantime happened in addition to the first one. The engine and 3 cars had broken from the other 15 cars, and of these 15, 2 or 3 cars had broken loose at the rear end. This left the train in four pieces, as follows: The engine and 3 cars, slowed up, and just reaching the summit; about 12 or 13 cars following; back of these, a third section, of 2 or 3 cars; and the caboose and 3 cars, stationary at Ramsay's cut. Very shortly after slowing up, the forward sec-

tion was struck by the second, and immediately the third struck the second. One of the cars in the first section was derailed. The striking cars rebounded, and started slowly on the down grade towards the cut, with no one aboard. The first intimation the lookouts on the rear section had was a lumber car looming out of the darkness. They shouted, and the flagman in the caboose and all the train hands got out or off. The third section struck the fourth, and this was immediately succeeded by a more violent second collision, caused by the second section striking the third. The caboose was driven into and mounted the wildcat engine, and tore off its valves. The escaping steam entered the caboose, and scalded the plaintiff. Of the serious character of his injuries, and of the amount of damages recovered, no question is raised, if in other respects there was no error. The assignments of error resolve themselves into five groups: (1) Was the release of the plaintiff valid? (2) Was there evidence of negligence on part of defendant to submit to the jury? (3) Was the court bound to give binding instructions that Ashley was guilty of contributory negligence? (4) Was there error in the admission or rejection of certain evidence? (5) Did the court fix an undue measure of care or duty as due from the defendant?

By the contract between the initial company and Jordan, the car and one man, in consideration of an agreed-upon freight charge, were to be carried to New York. The plaintiff was a passenger for hire, for his passage was one of the mutual terms of the arrangement for carrying the poultry. Had Ashley, being a passenger for hire, given a release to the initial company for the negligence of its servants, it would have been void. Railroad Co. v. Lockwood, 17 Wall. 358; Railway Co. v. Stevens, 95 U. S. 655; and Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U. S. 440, 9 Sup. Ct. 469. The release given by Ashley to the defendant company when it received him and his car cannot have any greater weight. With the car it received the through waybill, and if it accepted them it must accept them cum onere, which was the transportation of Ashley. No consideration whatever passed to him on signing the release, for by the original arrangement he already had a right to accompany the car to its destination. He was a passenger for hire, and as such the defendant was responsible for any injury to him resulting from the negligence of its servants.

This brings us to the second question, was there evidence of such negligence to submit to the jury? Clearly so. The company rules provide: Rule 47: "Every engineman is authorized to require the brakemen on his train to be at their posts; and no brakeman will be allowed to leave his post, or be in the car when the train is in motion." And 101: "Conductors of both passenger and freight trains are required to see that their brakemen do not remain inside the cars or cabooses, while the train is in motion, longer than is necessary to perform their indoor duties. * * * Brakemen must not ride on the engine." The court would not have been warranted in taking the case from the jury, for (under the rules of the company) on the evidence several elements of negligence were alleged upon which it was the province of the jury to pass. Was it

negligence in John Brady, the forward brakeman, to remain on the tender of the engine instead of on the forward part of the train? Was it negligence in Michael Brady, the middle brakeman, to be in the caboose instead of on the body of the train? Was the inspection a negligent and insufficient one? And, lastly, was it negligence to leave the wildcat engine so near the caboose in view of the broken condition of the train? The facts were such that reasonable men might fairly differ as to whether there was negligence or not, and where such is the case, the jury, not the court, must decide. Railway Co. v. Ives, 144 U. S. 408, 12 Sup. Ct. 679. Nor would the court have been justified in giving positive instructions that Ashley was guilty of contributory negligence. The terms of his permit did not require him to ride with the poultry car, and during many preceding trips he had occupied the caboose with the full consent of those in charge of the trains. Whether he was guilty of contributory negligence was, under the facts of this case, a question for the jury. It was fairly submitted to them by the judge below.

The gist of the defense was that the accident was unprecedented, extraordinary, and totally unexpected. Conceding, for present purposes, that Ashley went to sleep in the caboose (which, however, was one of the questions submitted to the jury), it cannot be said that he was, as a matter of law, guilty of contributory negligence in assuming that that would follow which the defendant's experienced employés looked for, namely, that the balance of the train was under the control of the engine, and would be backed slowly as soon as the break was discovered. We think the question of contributory negligence, under the facts and complicated questions of this case, was one to be decided by the jury, and it was left to them by the court in language of which the defendant had no right to complain.

Exception is taken to the testimony of Smith Hoover, showing the declarations of the plaintiff, made after the accident, viz.: "They told me to lay down here, and it would be all right; and it wasn't all right." The learned judge thought it part of the res gestae, and admitted it. We cannot say there was error in so doing. In the nature of things, there cannot be a sharply-defined line between what is and what is not permissible as part of the res gestae. In this debatable region a margin must be left for the exercise of the sound discretion of the trial judge. We cannot say there was error committed in this regard in the present case. It is not shown just how long after the accident Hoover arrived. Certain it is Ashley was still lying in the caboose. He was "going on terrible," as the witness says. No physician had arrived, nor steps been taken to relieve him. These spontaneous and repeated utterances from a man in the condition of the plaintiff, while on the very spot of the accident, and shortly following its occurrence, are so closely connected with, and a part of, the accident itself, that it was not error to admit them. Insurance Co. v. Mosley, 8 Wall. 397. Nor was the court in error in ruling out the answer of Michael Brady, the middle brakeman, who was asked whether there

was anything in the requirement of his duty which required him, while the train was going at that point under steam, to be out on the middle of it. It was not the province of the witness to determine whether he had done his duty; that was essentially the right of the jury. After the facts were laid before them, it was properly left to them. Elder v. Coal Co., 157 Pa. St. 499, 27 Atl. 545. The same remarks apply in a general way to the question which Thompson, the flagman, was not allowed to answer. He was, in effect, asked to take all the facts and surroundings of the case into consideration, and draw a conclusion which, if material to the issue, it was the duty of the jury alone to do.

Taking the charge and the points together, no error was committed in laying down the measure of care required of the defendant company. In the charge the attention of the jury was called to the fact that the plaintiff was traveling on a freight train, and that in taking passage thereon he accepted the usual incidents of such a train. The court said:

"The law does not, indeed, exact from railroad companies all the care and diligence which the human mind may possibly conceive, nor such as will render the transportation of passengers free from all peril. It does not require, for instance, steel rails and granite ties, because they are more lasting and less liable to decay than iron and wood. Nor upon freight trains, although passengers may be carried upon them at intervals, must there be air brakes, bell ropes, or a brakeman upon each car. But the law does require everything necessary to the security of the passenger, whether upon freight or passenger trains, and reasonably consistent with the business of the carrier, and the means and conveniences employed. This rule applies irrespective of any distinction made by the company in the character of its trains. Under it, however, when a passenger upon a freight train accepts and takes passage, he acquiesces in all the usual incidents of a freight train, managed by prudent and competent men."

This instruction in the general charge was as favorable as the defendant could ask for, and, taking the general language of the points in connection with this specific application of the law to the facts of the case, the court committed no error in its submission in that regard. After a careful examination, we are of opinion the case was fairly submitted to the jury, and the judgment must be affirmed, with costs.