JACK et al. v. MUTUAL RESERVE FUND LIFE ASS'N.

(Circuit Court of Appeals, Fifth Circuit. January 7, 1902.)

No. 1,091.

1. EVIDENCE—DECLARATIONS OF PERSON DECEASED—RES GESTÆ.

The modern tendency is to extend, rather than to narrow, the rule as to the admission of declarations as part of the res gestæ, especially in view of the fact that the parties are now generally permitted to testify in their own behalf, and to consider the grounds which formerly excluded such declarations as affecting their weight only.

2. SAME.

In an action on a life insurance policy by one Jack, as assignee, it was shown that the insured was a young man, recently married, and poor, who had been employed as a laborer by plaintiff for a number of years; that within a few months prior to his death his life had been insured in all for $21,000, all the policies having been assigned to plaintiff, who paid the premiums thereon; that he died from poison, and one Dr. Lipscomb had been convicted of his murder, for which offense also plaintiff had been tried and acquitted; that on the day preceding his death he was in town, and in and around plaintiff's store, as was also Dr. Lipscomb, who had conversations with plaintiff; that about 4 in the afternoon the doctor gave deceased a box, containing a single capsule, and told him to take it before going to bed, which he did; that within a few minutes thereafter he began to have convulsions, which followed each other at short intervals, and in the third of which he died; that between the second and third convulsions, with the consciousness of impending death, he made to his wife the following statement: "I am going to die. * * * Dr. Lipscomb killed me with a capsule he gave me to-night, and Guy Jack had my life insured, and hired Dr. Lipscomb to kill me." Held, that such statement as a whole, and each part of it, was admissible in evidence on the part of defendant, under the circumstances shown and as against the objections made, as a part of the res gestæ.

3. SAME—GENERAL SCHEME TO DEFRAUD—PROOF OF OTHER GENERAL ACTS.

Defendant in such action, in support of a defense that plaintiff had fraudulently procured the insurance and had murdered the insured, and for the purpose of connecting plaintiff with the acts of Lipscomb, was entitled to prove any fact which tended to show that they were acting in concert; and evidence that they had been engaged together in obtaining fraudulent insurance on the lives of others was not inadmissible because it tended to show the commission of other crimes by plaintiff.

4. SAME—PROOF OF CONSPIRACY—DECLARATIONS OR ACTS OF CONSPIRATOR.

In support of an allegation of a conspiracy between plaintiff and another to defraud a life insurance company by procuring the issuance of the policy sued on on the life of the insured and then murdering him, statements, declarations, or acts of the co-conspirator are not inadmissible because made or occurring after the death of the insured, on the ground that the object of the conspiracy had been accomplished, since it was not in fact accomplished, under such allegations, until the collection of the insurance.

5. TRIAL—INSTRUCTIONS—SUFFICIENCY OF EXCEPTIONS.

A general exception to the charge of the court, covering many matters and issues, is insufficient to raise any question thereon which can be considered in an appellate court.

6. APPEAL—REVIEW—INSUFFICIENCY OF RECORD.

An appellate court cannot consider statements of fact in the assignments of error not shown by the bill of exceptions.

7. EVIDENCE — MEASURE OF PROOF — ALLEGATION OF CRIME IN CIVIL ACTION.

In an action on a life insurance policy, a defense that the plaintiff aided and abetted or procured another to murder the insured need not

113 F.—4

be proved beyond a reasonable doubt; but it is sufficient if the jury, by all the evidence, are satisfied and convinced that the plea is true.

8. APPEAL—REVIEW—INSTRUCTIONS.

The failure of the trial court to give instructions requested cannot be assigned for error or considered by the appellate court unless it appears from the bill of exceptions that such instructions were requested and refused, and exceptions to such refusal were duly taken.

9. LIFE INSURANCE—ACTION ON POLICY—PARTIES.

The widow of an insured has no interest in a policy made payable to his legal representatives, and which had also been assigned by him to another, which will enable her to maintain an action thereon, where it appears that the deceased owed debts at the time of his death, and that his estate has not been settled.

In Error to the Circuit Court of the United States for the Southern District of Mississippi.

W. E. Baskin and T. W. Brame (C. C. Miller, on the brief), for plaintiffs in error.

R. F. Cochran, for defendant in error.

Before PARDEE and SHELBY, Circuit Judges, and BOARMAN, District Judge.

SHELBY, Circuit Judge. This is an action on a life insurance policy. It was brought in the circuit court of Noxubee county, Miss., and duly removed to the court below. Plaintiff Guy Jack sued as the assignee of the policy, and Lillie A. Stewart, the other plaintiff, sued as the widow and sole surviving heir of Charles T. Stewart, the insured. The policy was for $10,000, and had been issued by the defendant in error on the life of Charles T. Stewart. It was made payable to the executors or administrators of the insured. It had been assigned to Guy Jack with the consent of the defendant. After the case had been removed to the United States court, the defendant filed a plea denying the allegations of the declarations,—a plea of a general issue. Defendant, under the Mississippi practice, gave notice of special defenses that would be made. One of these defenses was that Guy Jack, designing to cheat and defraud, induced Charles T. Stewart to apply to the Mutual Benefit Life Insurance Company for a policy of insurance on his life for the sum of $10,000; and that he also induced Charles T. Stewart to make an application to the defendant, the Mutual Reserve Fund Life Association, for another policy of insurance on his life for $10,000; and that, when both of these policies had been issued, he persuaded Charles T. Stewart to assign them to him; and that, after the assignments were made, Guy Jack employed Dr. W. H. Lipscomb to kill Charles T. Stewart, and that Lipscomb did murder Stewart. Notice of other defenses was given, which it is not necessary to mention. Plaintiffs offered in evidence the policy of insurance on which the suit was brought and the assignment thereof to Guy Jack, and proved that Charles T. Stewart was dead. It was admitted in open court by the plaintiffs that Charles T. Stewart was poisoned, and that Lipscomb had been convicted of his murder. The evidence offered by the defendant tended to show that Lipscomb forged three applications for insurance on the life of Mrs.

Alice V. Hart, a widow in delicate health. These policies amounted to $12,500. One of them was made payable directly to Jack, and the others assigned to him. Lipscomb witnessed the assignment of both policies. These policies were issued without the knowledge of Mrs. Hart. When she learned of their existence, she had them canceled. Jack also held a large amount of insurance on the lives of other persons. In obtaining this insurance, Lipscomb was the medical examiner. Charles T. Stewart's life was insured in all for $21,000. The entire amount was held by Jack, as assignee, at the time of Stewart's death. Twenty thousand dollars of it had been in force for less than eight months. The policy sued on was assigned to Jack to secure the payment of a note for $10,000, payable one day after date, and of even date with the assignment. Stewart had signed his name to this note in the presence of three witnesses. Jack paid the premiums on these policies. He paid part in money and part in lumber. At this time Jack was insolvent. There were many unpaid judgments on record against him, and his property was mortgaged. There was some evidence tending to show that Jack and Lipscomb held themselves out as being unfriendly, when in fact they were friendly. While Jack was in jail, held to answer an indictment for the murder of Stewart, he wrote the following letter:

"Sept. 8, 1899. De Kalb, Miss., 3/3/97.

"Mr. Chas. W. Camp, Mutual Reserve Fund Life Ass'n, New York, N. Y.— Dear Sir: From a pleasant conversation had with you in your office last November I learned you first saw the light in our state, and that you are a Mason. Yr. assn. certainly feel kindly towards me for my letters to yr. pres. That no doubt caused you not to issue more insurance on life of W. B. Davis a short time before his death. What is needed is more light, that the innocent may be vindicated, and all the guilty punished,—an electric light thrown in the homes of people at Scooba, and skeletons brought from the closets. I have labored hard for years to obtain the facts that I now possess. I'm worth more to the state of Mississippi and insurance companies than a dozen lawyers or detectives. I don't want your attorney or mine to know anything about my knowledge of affairs. It might cause my death, and then justice would be cheated of her reward. All I demand is that the insurance companies back me, and the state of Mississippi protect me. A word from insurance companies will let me out on bail. On yr. command I'll visit your city, and we will have conference, and arrange matters satisfactory. Let me hear from you at your earliest some way, and oblige

"Yours very resp.,         Guy Jack."

There was other evidence offered by the defendant, which will be referred to in discussing the various objections and exceptions. The plaintiffs offered evidence explanatory of these various circumstances. There was a verdict and judgment for the defendant, and the plaintiffs sued out a writ of error.

### Objections to the Declarations of Charles T. Stewart.

Charles T. Stewart, the insured, was a young man, and had been married about a year before his death. He was poor, and had never owned his own home; the total value of his property being about $210. He had been almost continuously in the service of Guy Jack for about 15 years as a log hauler and helper in Jack's sawmills.

At the time of Stewart's death, Jack held $21,000 of insurance on his life, including the policy involved in this suit. Charles T. Stewart spent the whole of the 21st of January, 1897, in the town of Scooba, Miss. About 4 o'clock in the afternoon, on that day, Dr. W. H. Lipscomb wrote for him a prescription, and carried it to the drug store of Dr. J. G. Mooney to be filled. Dr. Mooney was absent, and Lipscomb left the prescription at the drug store. Later both Lipscomb and Mooney returned to the drug store, and Lipscomb called Mooney's attention to the prescription. The prescription called for ten grains of bromide quinine, ten grains of antikamnia, and three-sixtieths of a grain of strychnine, to be made into three capsules. Dr. Mooney filled the prescription, making the three capsules as prescribed. Dr. Lipscomb suggested at the time that Mooney should use the crystal or powdered strychnine instead of the tablets. Mooney placed the three capsules in a small red paper box, and wrote thereon, as directed in the prescription, "Take one at night." He gave the box to Lipscomb, who paid for the prescription. Lipscomb left the drug store with the box containing the three capsules, and soon met Charles T. Stewart and his father, J. M. Stewart, at the northeast corner of Guy Jack's store. Lipscomb took Charles T. Stewart aside, and said to him, "Bathe your feet and legs to your knees to-night, and take that capsule." He handed Stewart the red paper box. The box was opened, and it contained only one capsule. Charles T. Stewart then went home, getting there "about dark." He seemed cheerful and happy. He put up his horse, and fed him, and ate supper. He bathed his feet, and took the capsule, as directed by Lipscomb. In 10 or 15 minutes after taking the medicine he became very ill, and was seized with convulsions. Between the second and third convulsion he made declarations, which were proved by the evidence of his wife, and which were the subject of exceptions to be now considered. In the third convulsion he died. Only a few minutes intervened between the convulsions. He had taken only one capsule. The red box was examined immediately after his death, and it contained no other capsules. An autopsy of the body of Stewart showed that the cause of his death was poison by strychnine. One and one-half grains of strychnine were found in his stomach. Lipscomb and Jack were jointly indicted for the murder of Stewart, and, after a severance, Lipscomb was tried and convicted. On appeal to the supreme court of Mississippi the conviction was reversed. 75 Miss. 559, 23 South. 210, 230. He was again convicted, and on appeal the conviction was affirmed. 76 Miss. 225, 25 South. 158. Guy Jack was tried and acquitted. The circumstantial evidence in the record tends to connect Guy Jack with Lipscomb in causing the death of Stewart. The following excerpt from the evidence of Lillie A. Stewart, his widow, will show the declarations of Charles T. Stewart and the questions raised about them:

"Mr. Miller (attorney for the plaintiffs): We desire to submit this matter to the court out of the presence of the jury. (Jury sent out of court.) Q. Now, if Charley made any statement to you at that time, tell the court what he said. A. Well, he told me he was going to die; that he had been dead; and that the good Lord had sent him back to tell me that Dr. Lipscomb had

killed him with a capsule he had given him that night; and that Guy Jack had his life insured, and that he had hired Dr. Lipscomb to kill him. (Plaintiff objects to the statement of the witness: (1) 'That he was going to die,' and separately to that part (2) 'that he had been dead,' and (3) 'that the good Lord had sent him back to tell me that Dr. Lipscomb had killed him with a capsule he had given him that night'; (4) 'That Guy Jack had his life insured, etc.'; and (5) plaintiff objects to the entire statement, as a whole, making each of said objections separately and severally, upon the ground that said statement, and the separate parts objected to, are each irrelevant, immaterial, and incompetent.) The Court: I am going to sustain the objection to this part: 'That he had been dead, and the good Lord had sent him back to tell me;' and will not permit it to go before the jury. The other, taken in connection with all of the facts in the case, * * * I will overrule the objection to, and the jury will consider it, subject to the instructions of the court. (Plaintiff excepted separately. The jury were returned into the court.) Mr. Miller: Our objection is not confined to the language that you strike out, but we object to the whole statement. * * * The Court: Yes, you object to each part specifically, and then as a whole. Mr. Miller: We withdraw our objection to that part of the statement 'that the good Lord had sent him back,' and let her make the statement in full, but our objection will stand to all the balance, except that part 'that the good Lord had sent him back.' The Court: I don't think it is proper for that part to go before the jury, however. Mr. Bozeman (attorney for the defendant): We would prefer that just that part go to the jury that is competent. * * * Q. Mrs. Stewart, if Charley Stewart made any statement to you at the time referred to when your examination was interrupted, tell the court and jury what Charley Stewart said to you. A. Tell it like I did before? Q. Just tell the jury— The Court: Tell what he said. A. Well, he said: 'I am going to die, and I have been dead;' that 'Dr. Lipscomb killed me with a capsule he gave me to-night; and Guy Jack had my life insured, and hired Dr. Lipscomb to kill me.' Q. Now, how long did he live, Mrs. Stewart, after he said that? A. I don't know, sir, exactly. It was not very long. Q. Well, about how long did he live, Mrs. Stewart? A. I couldn't tell exactly. Q. A few moments, or an hour or two, or what? A. Well, I don't know. It was not very long, because I know I left the bed, and went and sat down on some wood that was put in there to make a fire with, and Mr. Duran stepped over to the bed, and told me he was dead, and I don't think it had been very long. Q. I believe you stated that he made that statement to you after the second convulsion? A. Yes, sir; he died in the third convulsion."

Before making this statement, Stewart had called on a negro man present to pray for him, and it clearly appeared otherwise that he was conscious of impending death. This being a civil case, however, these declarations are not offered as dying declarations. Dying declarations, as such, are admitted only in the case of a trial for the homicide of the declarant, and then on the ground that they were made in extremis. 1 Greenl. Ev. § 156. And Wharton says: "We may conclude, therefore, that such declarations are limited to criminal prosecutions when the subject-matter of the investigation is the declarant's death." Whart. Cr. Ev. (9th Ed.) § 288. But declarations made in extremis are often legal evidence in civil cases, for where they constitute part of the res gestæ, or come within the exceptions of declarations against interest, or the like, they are admissible, as in other cases, irrespective of the fact that the declarant was under apprehension of death. 1 Greenl. Ev. § 156. It is, of course, a general rule that the declarations of no man are admitted in evidence without the sanction of an oath and opportunity for cross-examination. But exceptions to the hearsay rule

are as well established as the rule itself. There is much difficulty and much conflicting authority in the application of the exceptions. The declarations in this case are accompanied by the circumstances that usually accompany such declarations when admitted. The declarant is dead, and cannot be produced as a witness. The declarations were made without opportunity or cause for wariness or falsehood, and, besides, they were made under the sense of impending death; and, while not admissible, as we have said, as dying declarations, the fact that the declarant knew he was dying is looked on in the law in graver cases than this as dispensing with the necessity of an oath. The declarations of the individual made at the moment of a particular occurrence, where the circumstances are such that we may assume that his mind is controlled by the event, are received in evidence as a part of the res gestæ because they are supposed to be involuntarily forced out of him by the particular event, and thus have an element of truthfulness which they might not otherwise have. They must be undesigned declarations incident to a particular litigated act, and illustrative of such act. If one, immediately upon being shot, cries out, "I am shot! I am killed!" and names his assailant, these declarations would, without question, be admitted as a part of the res gestæ. In Com. v. Hackett, 2 Allen, 136, the victim was heard to cry out: "I am stabbed!" The witness at once went to him, and within 20 seconds after that heard him say: "I am stabbed. I am gone. Dan. Hackett has stabbed me." This evidence was held competent as a part of the res gestæ. While it is said that the declarations must be contemporaneous with the main fact, no rule can be formulated by which to determine how near, in point of time, they must be. No two cases are exactly alike, and the determination of this question is always inseparable from the circumstances of the case at bar. The transaction in question may be such that the res gestæ would extend over a day, or a week, or "a month." Rawson v. Haigh, 2 Bing. 99; Insurance Co. v. Mosley, 8 Wall. 397, 407, 19 L. Ed. 437; People v. Vernon, 95 Am. Dec. 58, note, and cases there cited. In this case the fatal capsule was handed to the victim in the afternoon, but not taken till bedtime. If Lipscomb, instead of giving him the capsule and prescription on the streets in the afternoon, had called at his house, and given it to him, and left a minute before it was swallowed, the declarations would have been brought nearer in point of time to the moment that Lipscomb had handed Stewart the medicine; but we cannot see that the rule as to the admissibility of Stewart's declarations would have been different. If one threw a bomb, which immediately exploded, and killed another, the declaration of the dying man as to who threw it would be a part of the res gestæ. If the assailant, instead of throwing the bomb, had placed it concealed, and fixed to explode in an hour or in 10 hours, when it exploded, the involuntary exclamation of the fatally wounded man, naming the person who had placed the bomb near him, would be, we think, a part of the res gestæ. So we do not think that these objections gain any weight from the length of time which elapsed between Lipscomb's act of handing the capsule to Stewart and his declarations.

The declarations were made while Stewart was suffering from the effect of Lipscomb's act. The objection to the whole declaration, we think, was properly overruled.

That part of Stewart's declaration, "That he had been dead, and the good Lord had sent him back to tell me," was excluded by the court, and no question as to its admissibility is before us. Separate objections to other portions of the declarations were overruled, and exceptions reserved. The statement "that he was going to die, which is separately objected to, made 10 or 15 minutes before he died, was admissible as showing his physical condition. Such declarations are always received. Besides, it could not injure the plaintiffs. The statement "that Dr. Lipscomb had killed him with the capsule he had given him that night" is, we think, clearly admissible.

The next objection, as it appears in both the printed and original transcripts, is addressed to the statement "that Guy Jack had his life insured, etc." That Jack had insurance on Stewart's life is not a disputed question. This suit is to collect such insurance, and Jack admitted as a witness that he had $21,000 of insurance on Stewart's life when he died. Again, the part of the declaration reciting "that Guy Jack had his life insured" is unobjectionable. The court was justified in overruling the objection, even construing it to embrace the words "and that he hired Lipscomb to kill him," because the objection included evidence to which no objection could be well taken; for, if an objection covers any admissible evidence, it is properly overruled. U. S. v. McMasters, 4 Wall. 680, 18 L. Ed. 311. The only material part of the sentence to which it is claimed that this objection is addressed is "that he [Jack] had hired Dr. Lipscomb to kill him." If we are to treat this part of this sentence as covered by the objection, and as separately objected to, as it has been treated by counsel, though it is not set out in the objection, it presents a question difficult of solution. The words we have just quoted are not embraced in the objection, unless they are included by the addition, "etc.," to the objection. The objection is made that the declaration is "irrelevant, immaterial and incompetent." It may be doubted if these objections are sufficiently specific to require us to review the ruling on them. We learn from the argument for the plaintiffs in error that the objections to this statement, "That Jack had his life insured; that he had hired Lipscomb to kill him,"—are that it narrates a past transaction; that the declarant could have had no knowledge of the fact stated; that it is mere opinion; in short, that it is hearsay,—does not come properly within the exception as to the res gestæ. In Insurance Co. v. Mosley, 8 Wall. 397, 19 L. Ed. 437, the action was on an accident policy. The insured accidentally fell downstairs, receiving injuries from which he died. The circumstances of the accident were proved only by the declarations of the insured made to his wife and son. He was sleeping upstairs, and went down. When he came back, he told his wife he had fallen down the back stairs, and received injuries. He made similar declarations to his son. The supreme court held these declarations admissible as a part of the res gestæ. "To bring such declarations within the principle," said the court, "generally, they must be contemporaneous with

the main fact to which they relate. But this rule is by no means of universal application." The court then quoted approvingly Baron Pork in Rawson v. Haigh, 2 Bing. 99, as saying:

"It is impossible to tie down to time the rule as to the declarations. We must judge from all the circumstances of the case. We need not go to the length of saying that a declaration made a month after the fact would, of itself, be admissible; but if, as in the present case, there are connecting circumstances, it may, even at that time, form a part of the whole res gestæ."

After quoting other cases, the court said:

"Here the principal fact is the bodily injury. The res gestæ are the statements of the cause made by the assured almost contemporaneously with its occurrence, and those relating to the consequences made while the latter subsisted and were in progress. * * * Rightly guarded in its practical application, there is no principle in the law of evidence more safe in its results. There is none which rests on a more solid basis of reason and authority. We think it was properly applied in the court below. In the ordinary concerns of life no one would doubt the truth of these declarations, or hesitate to regard them, uncontradicted, as conclusive. Their probative force would not be questioned. Unlike much other evidence, equally cogent for all the purposes of moral conviction, they have the sanction of law as well as of reason. The want of this concurrence in the law is often deeply to be regretted. The weight of this reflection, in reference to the case under consideration, is increased by the fact that what was said could not be received as 'dying declarations,' although the person who made them was dead, and hence could not be called as a witness."

State v. Thompson, 132 Mo. 301, 34 S. W. 31, was a trial for murder, by poison contained in a luncheon claimed to have been handed deceased by the defendant. It was held that the statements of deceased, while eating the luncheon, as to how and from whom he received it, were admissible as a part of the res gestæ.

It cannot be said that Stewart certainly had no knowledge of the fact stated. He, Jack, and Lipscomb were at the rear end of Jack's store, talking, the afternoon that Lipscomb gave Stewart the capsule. Lipscomb was in Jack's store that afternoon. What knowledge Stewart had as to what occurred we cannot know. It is enough that he makes the statement as a fact. The jury were, of course, not bound to believe the statement. If the circumstances indicated a want of knowledge in the declarant on the subject of the declarations, that would be considered as lessening or destroying the weight of the declarations. That would be for the jury. 1 Greenl. Ev. 160; People v. Taylor, 59 Cal. 640, 645. In Insurance Co. v. Mosley, supra, the court said, referring to the doctrine of res gestæ: "The tendency of recent adjudications is to extend, rather than to narrow, the doctrine." And Lord Chief Justice Cockburn said: "People were formerly frightened out of their wits about admitting evidence, lest juries should go wrong. In modern times we admit the evidence, and discuss its weight." Reg. v. Churchwardens, etc., of Parish of Birmingham, 1 Best & S. 763; State v. Thompson, 132 Mo. 321, 34 S. W. 31. The fact that the defendant now is allowed to testify has greatly tended to liberalize the rule as to declarations claimed to be part of the res gestæ.

The case has been argued as if a specific objection had been made separately to that part of the declaration that Jack had hired Lips-

comb to kill the declarant, and we have examined the case as if such objection had been made, and we are of opinion that, in view of all the circumstances, this case should not be reversed, because this declaration was admitted.

## Other Objections to Evidence.

To make Lipscomb's acts evidence against Jack, it was necessary to show that they had conspired to defraud the defendant. It is not often that direct proof of such a conspiracy can be made. Usually it must be proved by a variety of circumstances. One circumstance, standing alone, may seem trivial; but, if it is relevant, it is evidence, and many circumstances may be convincing proof. It was admissible to prove Jack's relations to Lipscomb,—that they appeared to be unfriendly, but were in fact on good terms, and that they were connected in securing other fraudulent insurance. Jack's declarations that Lipscomb was a "very handy man for him to use in getting out bad insurance risks," and in fact any circumstance, were admissible that tended to show they were acting in concert. Objections to such evidence were all properly overruled. It is, of course, true that evidence of another and distinct crime committed by a defendant, in no way connected with the one for which he is on trial, is inadmissible. If, however, the evidence is relevant, if it tends to prove the commission of the offense for which the defendant is on trial, it must not be excluded because it also shows that the defendant has committed another offense. Wood v. U. S., 16 Pet. 342, 10 L. Ed. 987; Wallace v. State, 41 Fla. 547, 26 South. 713; Barnett v. Insurance Co., 115 Mich. 247, 73 N. W. 372.

One of the issues submitted to the jury was whether Jack secured the insurance on the life of Stewart in good faith to secure a debt Stewart owed him, or did he procure it for improper purposes, and with criminal motives. On such issue it was admissible, considering the evidence of Lipscomb's connection with Stewart's death, for the defendant to show that Jack and Lipscomb were engaged in the business of procuring fraudulent insurance, and that the insurance on Stewart's life was a part of such scheme. State v. Brady (Iowa) 69 N. W. 290, 36 L. R. A. 693; Beberstein v. Territory (Okl.) 58 Pac. 641; People v. Summers, 115 Mich. 537, 73 N. W. 818; Carroll v. Com., 84 Pa. 107; Whart. Cr. Ev. (9th Ed.) 31; 3 Greenl. Ev. 15.

After Stewart's death, Jack made proof to secure the insurance money on his life by sending a statement to Lipscomb, to be signed by him. Lipscomb was at that time in jail, charged with Stewart's murder. The record also shows that incidents occurring between Jack and Lipscomb, and statements and declarations made by Lipscomb after Stewart's death, were received in evidence. It is urged here that there was error in receiving this evidence, because, if a conspiracy had been established to kill Charles T. Stewart, the same had been accomplished, and that no declarations or conduct of Lipscomb could be admissible in evidence against Guy Jack after the accomplishment of the conspiracy. The fallacy of this position is that the conspiracy did not have for its aim and end the killing of

Stewart. The purpose of the conspiracy was to get the insurance on his life. If this could have been accomplished without Stewart's death, he probably would not have been poisoned. His death was an incident, but not the end, of the conspiracy. If, after his death, part of the insurance money had been collected, and divided between Jack and Lipscomb, can any one doubt that such evidence would have been admissible as tending to show the conspiracy and its purpose? The court did not err, we think, in admitting proof of the conduct of Lipscomb, after the death of Stewart. Holt v. State (Tex. Cr. App.) 46 S. W. 829; State v. Byers (Mont.) 41 Pac. 708.

### Charge of the Court.

The entire charge of the court is in the bill of exceptions. The bill of exceptions shows that plaintiffs reserved an exception to the whole charge. Such exception to the entire charge, consisting, as in this case, of several closely printed pages, cannot avail to secure a reversal.

This exception is also reserved: "We also except to the language read by your honor from the book." The bill of exceptions does not show what language was read from the book. The assignment of error following this exception purports to set out what was read by the trial judge as a part of his charge. But we cannot consider statements of fact in the assignment of errors not based on the bill of exceptions. Unless the bill of exceptions certified by the judge showed what was read as a part of his charge, and the exception thereto, the question is not before this court for review.

The court was requested by the plaintiff to charge the jury that they "must be satisfied beyond a reasonable doubt arising from the evidence that Guy Jack was implicated in the murder." The court said, "I do not think that is the law, and I decline to give the instruction." This is a civil case. The defendant, by plea, averred that Guy Jack, the plaintiff, aided and abetted Lipscomb or procured him to murder Stewart, the insured. The burden was on the defendant to prove its plea, but it was not required to prove it beyond a reasonable doubt. If the jury was, by all the evidence, satisfied and convinced that the plea was true, that was sufficient.

### Written Instructions Requested.

It appears from the printed transcript that during the progress of the trial the judge presiding requested the attorneys for the parties to present to the court written instructions, so that the court might be advised as to their respective theories of the case. The attorneys for the plaintiffs handed to the court before the argument began 30 separate written charges, numbered from 1 to 30, inclusive. Some of these charges were marked, "Given for the convenience of the court in charging the jury." "The remaining instructions," the transcript states, were not passed upon by the court, nor were any exceptions taken by the plaintiff on account of the failure of the court to give the instruction to the jury, or to mark them "Given" or "Refused." It is assigned as error that the court did not give these 30 charges. These charges do not even appear in the bill of

exceptions. The bill of exceptions does not show that any exceptions were reserved to the refusal of the court to give them. On the contrary, the statement which follows the copy of the charges in the transcript shows affirmatively no exceptions were taken to the failure of the court to give the charges. Unless it appears in the bill of exceptions that a charge was requested, and refused by the court, and an exception duly reserved, no question is presented in regard to such charge for decision by this court. These charges are embodied a second time in the transcript, being set out in a motion for a new trial, the refusal to give them being assigned as one of many grounds for a new trial. The refusal of the court to grant a new trial is assigned as error. We have often held that the granting or refusing a new trial is in the discretion of the trial court, and that its decision cannot be reviewed by this court. Such is the unvarying rule of the federal courts.

## Mrs. Stewart's Alleged Interest.

Lillie A. Stewart, widow of the insured, was joined as plaintiff in the suit. In rulings on the admission of evidence and in the charge to the jury the trial court held that on the undisputed evidence she had no interest in the action. The policy in suit was made payable, not to his wife, but to the executors or administrators of the insured. Charles T. Stewart, the insured, assigned the policy, with the consent of the insurance company, to Guy Jack. No other assignment of it had been made. The declaration filed by both of the plaintiffs states these facts. For the purpose of showing an interest in Mrs. Stewart, it is alleged in the declaration that she "furnished proofs claiming the proceeds of said policy as the widow and only heir at law of said Charles T. Stewart," and that Guy Jack had furnished proofs claiming the proceeds of the policy under the assignment from the insured. Then follows the statement that "plaintiffs have adjusted their respective claims to the proceeds of said policy of insurance, and agreed on a basis of settlement of the same." There is evidence in the record that Charles T. Stewart owed debts at his death. If the assignment is to be regarded, Jack alone, as assignee, owns the policy; if the assignment be ignored, the policy being payable to the executors or administrators of the insured, they alone could sue on it. In Insurance Co. v. Jack, 76 Miss. 788, 25 South. 871, an action was brought by Jack and Mrs. Stewart on a life insurance policy assigned to Jack, which was payable to the executors or administrators of the insured. The court held—properly, we think—that Mrs. Stewart was a stranger to the contract; that, if she had made an agreement with Jack as to a division of the proceeds, that was a contract with which the insurance company had no concern. We concur in this view. The record in this case shows affirmatively that Mrs. Stewart had no right of action on the policy. In this case, by her pleading, she is affirming that the policy was assigned to Jack.

The judgment of the circuit court is affirmed.