GUILD et al. v. PRINGLE.

(Circuit Court of Appeals, Fourth Circuit. May 25, 1904.)

No. 497.

1. EVIDENCE—RES GESTÆ—STATEMENT OF PERSON INJURED.

A declaration by a man who had fallen into an excavation for a sewer in the night, and received a fatal injury, that there was no light there, made some 10 minutes after the fall, during a conversation with a person above, and in answer to a direct question, goes beyond a statement respecting the immediate cause of the injury, which was the fall, and is inadmissible as a part of the res gestæ.

In Error to the Circuit Court of the United States for the District of South Carolina, at Charleston.

See 118 Fed. 655; 119 Fed. 962.

P. H. Nelson and R. W. Shand, for plaintiffs in error.

D. W. Robinson (Wm. H. Lyles, on the brief), for defendant in error.

Before GOFF, Circuit Judge, and BRAWLEY and McDOWELL, District Judges.

McDOWELL, District Judge. This was an action for damages instituted in the State court by the administratrix of R. S. Pringle against Guild & Co., and removed by the defendants below (plaintiffs in error here) to the federal court.

The city of Columbia, S. C., early in 1902, entered into a contract with Guild & Co. to lay a considerable quantity of sewer pipe. On August 4, 1902, about half past 8 o'clock at night, one R. S. Pringle

¶ 1. See Evidence, vol. 20, Cent. Dig. §§ 373, 375.

fell into an excavation which had been made by Guild & Co., and was so injured that he died on the 15th of the same month. At the time of the injury, Pringle was returning from a meeting held at a church on the north side of Indigo street to his home, which was west of the church, and on the south side of Indigo street. In Indigo street, from a point nearly opposite the church to a point west of Pringle's house, a trench had been dug by Guild & Co., 14 feet deep and 3 feet wide, at the side of which was an embankment from 7 to 9 feet high, made by piling the earth excavated from the trench. The only crossing place left in the length of this trench was a railroad crossing of Indigo street. At this point the contractors, for the purpose of tunneling under the two railroad tracks, dug a hole between the two tracks. This hole, into which Pringle fell, was about 4 feet wide, 5 feet long, and about 14 feet deep. The earth removed therefrom had been entirely, or almost so, thrown outside of the tracks. In crossing at this point, Pringle was taking a convenient route home, and one at that juncture, because of the long trench, much used by the public. This hole appears to have been open from the 1st of August until after the accident in question. It was never covered over with planks at night, nor was any precaution taken to prevent such accidents, unless it was that a red light was left at the side of the hole, and as to this there is a conflict of testimony. Fencing this hole seems to have been impracticable, as the distance between the two railroad tracks was insufficient to leave requisite "car clearance." There was an electric arc light about 85 feet from this hole, which appears to have been in operation at the time of the accident. But apparently this light was at times insufficient to enable travelers to observe or correctly locate the hole. There is, as above stated, a conflict of testimony as to the presence of a lantern at the hole on the night of the accident and on the preceding nights. The witnesses for the defendants below, testifying that the lantern was there, much outnumber those for the plaintiff below, testifying to the contrary. At the time in question there was in force an ordinance of the city of Columbia, reading, so far as is now of interest: "Excavations in any street or alley shall be securely covered at all times when persons are not at work therein. * * *" In the contract made between Guild & Co. and the sewer commissioners for the city are the following clauses:

"The contractor shall observe and obey all city ordinances in relation to obstructing streets, keeping open passage ways, and protecting the same where exposed.

"Suitable barriers shall be placed around all excavations, and sufficient danger signals maintained at night to prevent accidents to street passengers.

"All the responsibility for the entire line of sewers and accidents occurring therewith shall rest with the contractor building the works until the completion and acceptance."

The jury returned a verdict of $5,000 against the plaintiffs in error, and judgment in accordance therewith was entered.

The first assignment of error is to the action of the trial court in admitting the testimony of W. R. Henderson, who repeated a declaration made by Pringle, and to the subsequent admission by the

court of similar testimony by other witnesses. This testimony, as preserved in the bill of exceptions, is as follows:

"On the trial of this cause, the plaintiff called as a witness on her part one W. R. Henderson, who testified as follows: Q. How soon after the accident did you see him [plaintiff's intestate] on the night of August the 4th? A. It was ten minutes before I got there. The reason of my delay was caused by the fact that when I heard it I went back to secure ladders. * * * Q. When you went to the hole on the night of August 4th, what did you find? A. Well, I found that Mr. Pringle was down at the bottom of the hole, and some people gathered about there. Q. What did you do? A. Well, by that time they had brought the ropes and ladders, and we tried to get him out. Q. Can you tell us who was there that you knew? A. By the time I got there, Mrs. Pringle, my sister, Morgan Hooper, and Oscar Alexander, two men employed in the mills stables, and a man employed to oversee, and the foreman of the street gang was in the hole at the time. All these and Preston Tredwell was present. Q. Was Mr. Alston Pringle there? A. Yes, sir; and watchman of the A. C. L. Q. Did you go down in the hole? A. I did not. Q. What was Mr. Pringle's condition, as far as you could ascertain, at that time? A. I could see in the hole; there being a lantern. I could see he was in the corner, in a crouching position, with his leg doubled under him, struggling to sit up, and groaning, and laying as he fell. Q. Did he have any conversation with you? A. Yes, sir. Q. Was it intelligent? A. Perfectly so, sir. Q. Did he state anything in regard to the accident, and how he came there at that time? A. Yes, sir. (Defendants' counsel objects to any statement made by Mr. Pringle being given. * * * Counsel for the plaintiff and defendants argued the admissibility of the statement made by Mr. Pringle being given.) The Court: I will admit the question as part of the res gestæ. (Defendants' counsel excepts to the ruling.) Q. Where was it? A. Right on the edge of the hole. Q. Was he suffering much at that time? A. Undoubtedly. He was groaning. Mrs. Pringle asked him the question, 'How did you come to fall in here?' He said, 'No lamp put there.' He said he was coming back from the meeting, and there was no lamp at the hole at all. I think that was about the drift of the conversation. (To which ruling of the court, in overruling said objection and permitting said witness to give said testimony, the defendants duly excepted.)

"And after said ruling was made, plaintiff introduced as a witness Alston Pringle, who testified as follows without objection: A. When he [plaintiff's intestate] asked me to get him out as soon as possible, I turned around to go to the fire department to get Mr. Henderson to bring his hands, ladder, and a rope to get him out, and I met him about one-half way between his house and my brother's, and I told him what had happened, and asked him to telephone for a doctor, and then I returned to the hole; and, in a few minutes, parties came with the ladder, and it was put down, and I went down, and I was the first one to go down in the hole. I said, 'Bob, how in the world did this happen?' He said, 'I was coming from the meeting, and I stepped with my left foot and dropped in.' I said, 'Are you hurt?' And he said, 'My hip is broken, or I am paralyzed.' The men commenced coming down. They spread a blanket, and I went up. Q. Did he make any statement about the light? A. I asked the question, 'Was there any light?' and he said, 'No light.' This watchman—this man—said, 'There was a light.' I said, 'No use to have a discussion here. We will adjust it later.'

"Plaintiff also introduces as a witness Mrs. R. S. Pringle, who testified, without objection, as follows: Q. Did you make any remark to your husband while he was in the hole? A. I did. Q. What did he say? A. He said he was suffering great agony, and I asked him how it happened, and was there no light? And he said, 'No light,' and the foreman said, 'There was a light,' and he said, 'There was not a light,' and that was all that was said. Q. Where was the foreman standing when he made the remark? A. To my left, at the top of the hole. Q. And he answered to that? A. Yes, sir; he did.

"Also Miss E. L. Henderson, who testified as follows: Q. Did you hear any conversation or speech by Mr. Pringle from down in the hole to his wife in regard to the accident? A. Mrs. Pringle said: 'Papa, how did you fall down?

Was there no light?' The man in the hole said: 'There was no light. There was when I went, but none when I came back.' And she said: 'Are you hurt? Where are you hurt?' And he said: 'I don't know. I am in agony.' "

It should be here added that the absence of the lantern after the accident is accounted for by the testimony of several of the witnesses for defendants below that the first person to arrive at the place after the injury picked up and carried away the lantern, in search for means of getting Pringle out of the hole.

The question here presented is not free from difficulty. The facts in this case are in many respects so closely similar to the facts in Insurance Company v. Mosley, 8 Wall. 397, 19 L. Ed. 437, that it is not surprising that the learned trial court felt bound, in order to follow that case, to admit the declarations of Pringle. In the Mosley Case, it appears that the injured man, after having gone to bed, got up between 12 and 1 o'clock at night and went downstairs for the purpose of going into the backyard. Shortly thereafter—just how long does not appear—Mosley's son found him apparently in great pain, and "asked what was the matter. He replied that he had fallen down the back stairs and hurt himself very badly." A short time later Mosley made practically this same statement to his wife. Some time thereafter Mosley died of this injury. An action founded on an accident insurance policy was brought by his wife, in which evidence that Mosley's death was caused by an accident, and not by disease, was vitally necessary to the maintenance of the plaintiff's cause of action. The Supreme Court held that the evidence of the son and wife, giving Mosley's declaration that his then condition of injury was caused by a fall down the stairs, was admissible as part of the res gestæ. The reason given for this ruling is:

"In the complexity of human affairs, what is done and what is said are often so related that neither can be detached without leaving the residue fragmentary and distorted. There may be fraud and falsehood as to both, but there is no ground of objection to one that does not exist equally as to the other. To reject the verbal fact would not unfrequently have the same effect as to strike out the controlling member from a sentence, or the controlling sentence from its context."

In the case at bar the condition in which Pringle was found was so intimately connected with the immediate cause thereof—the fall into the excavation—that his declaration to Alston Pringle that he fell or stepped into the hole, was, under the Mosley Case, properly admitted. The part of Pringle's declaration, however, which is complained of, is the statement that there was no light at the hole. In making this statement, Pringle was going back of the immediate cause of his injury—the fall—and was stating the cause that led to the fall. In admitting this part of the declaration, the trial court, as we think, went a step beyond what is authorized by the Mosley Case. Had the first part of the testimony of W. R. Henderson, as reported, been an exact account of the occurrence, it would be very difficult, if not impossible, under the ruling in the Mosley Case, to say that his testimony was inadmissible. When an injured man, shortly after his injury, while still suffering intensely, is found at the bottom of a deep hole, and is asked, "How did you come to fall in here?" and an-

swers, "No lamp put there," it is difficult to discriminate the case from the Mosley Case. The question assumes a fall as the immediate cause of the injury, and the mind of the injured man is, perhaps for the first time since the injury, directed to the cause of the fall. His answer may have been unpremeditated, spontaneous, involuntary. It enables comprehension of the principal fact—the injury—and is in some sense rather intimately related thereto. However, Mr. Henderson adds that he is giving merely the gist of a conversation, and the testimony of the other witnesses leads us to the belief that the declaration here was not made under the circumstances or in the exact manner indicated by the first part of Mr. Henderson's testimony. The declaration that there was no light was made in answer to a suggestively leading question. It was a part of a conversation on the subject of the presence or absence of a light. Whether Alston Pringle's testimony relates to the same conversation as that between Mrs. Pringle and her husband, or to another, we cannot be sure. But in either event it is clear that Pringle's declaration as to the absence of the light was an apt and reasoned reply to a question. He was clearly not in such pain as to be incapable of reasoning, reflecting, and, if he thought fit, making a possibly untrue and self-serving declaration. In no sense can we consider Pringle's declaration that there was no light as an involuntary, exclamatory, spontaneous "verbal act." He immediately followed this statement with the explanation that there had been a light when he went to the meeting, but that there was no light when he came back. The objectionable part of Pringle's declaration has not the sanction of an extreme probability of truth, coming from an unpremeditated and spontaneous exclamation made at the time of or immediately after the injury, nor is it so intimately connected with the principal fact as to be a verbal act, essentially a part thereof. To admit the declaration as to the light is to extend the doctrine of the Mosley Case beyond the limit warranted by that case, and it is to lose sight of what we think is the true reason for the rule of evidence in question.

We do not base our conclusion on the mere fact that there had been a sufficient interval of time between the injury and the declaration to allow premeditation. To exclude a declaration which might otherwise be a part of the res gestæ, there must have been not only time for the manufacture of self-serving evidence, but also opportunity otherwise. If, in a case of personal injury, the declarant has been in such great pain as to be incapable of reasoning and recollecting, his statement made after even a very considerable interval of time may be fully as spontaneous and unpremeditated as if made at the very moment of the injury. See 1 Greenleaf Ev. (14th Ed.) 145, and note "a"; Beaver v. Taylor, 1 Wall. 642, 17 L. Ed. 601, 7 Rose's Notes 74; Delaware R. Co. v. Ashley, 67 Fed. 213, 14 C. C. A. 368; Peirce v. Van Dusen, 78 Fed. 707, 24 C. C. A. 280; Jack v. Association, 113 Fed. 54, 51 C. C. A. 36; note 95 Am. Dec. 51; 1 Wharton Ev. (3d Ed.) § 261.

Having reached the conclusion that it was error to admit Pringle's declaration as to the absence of a light, it is unnecessary to consider the remaining assignments of error. Some ten or more witnesses,

nearly all of them apparently wholly disinterested, testified for the defendants below that a red lantern was at the time of the accident on the ground at the edge of the hole. And one of them testified that Pringle himself said that he saw the light, and explained the fall by saying that he thought he was on the railroad, and not between the tracks. For the plaintiff below, there was one witness who stated that there was no light at the hole about 15 minutes prior to the accident, and four who testified as to the absence of a light on nights other than that of the accident. Pringle's declaration may have been given great weight by the jury. Every experienced practitioner knows the force of a declaration made by an injured man, who shortly thereafter dies of his injury. Many juries give such statements undue weight.

We do not intend to intimate that merely placing a lantern by the side of the hole would or would not have been sufficient to excuse the defendants below of the charge of negligence. Nor do we mean to intimate, if a lantern was put there, that there was or may have been contributory negligence on the part of Pringle. But if the jury believed that no lantern was there, they may, in fixing the damages, have been influenced by a very natural feeling of just indignation against the defendants below. To leave such an excavation at such a place unprotected either by covering or by a warning lantern was gross negligence, such as to indicate a wanton disregard for the rights of others. It follows that the question of fact as to the presence of the lantern was of the first importance in respect to the amount to be allowed in damages. As evidence which we think was improper was admitted on this question, we are constrained to reverse the judgment of the trial court, and to direct a new trial.

Reversed.